SONAL N. MEHTA (SBN 222086)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
Sonal.Mehta@wilmerhale.com

DAVID Z. GRINGER (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
250 Greenwich St.
New York, NY 10007
Telephone: (212) 230-8864
Facsimile: (212) 230-8888
David.Gringer@wilmerhale.com

SETH P. WAXMAN (*pro hac vice*)
HOWARD M. SHAPIRO (*pro hac vice*
forthcoming)
JONATHAN E. PAIKIN (*pro hac vice*)
DEREK A. WOODMAN (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Seth.Waxman@wilmerhale.com
Howard.Shapiro@wilmerhale.com
Jonathan.Paikin@wilmerhale.com
Derek.Woodman@wilmerhale.com

*Attorneys for Defendant*
INTUIT INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>        v.<br><br>INTUIT INC.,<br><br>                              Defendant. | Case No. 3:22-cv-01973-CRB<br><br>**DEFENDANT INTUIT INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Charles R. Breyer<br>Hearing Date: April 21, 2022<br>Hearing Time: 10:00 a.m. |

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................................ vi

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ..................................................................................................2

        A.      Factual Background ..................................................................................2

                1.      TurboTax Free Edition..................................................................2

                2.      Intuit's Decision To Stop Running The Challenged
                        Advertisements.............................................................................4

        B.      The FTC's Investigation ..........................................................................5

        C.      The FTC's Complaint And TRO Motion..................................................6

III.    ARGUMENT .......................................................................................................7

        A.      Legal Standards........................................................................................7

        B.      There Is No "Emergency" Warranting Immediate Injunctive Relief
                Because Intuit Has Removed The Challenged Advertisements .................8

        C.      The FTC Is Unlikely To Succeed On The Merits Because Intuit's
                Marketing Was Not Deceptive...................................................................9

                1.      Intuit's Advertisements Of A "Free" Product Are Not False—
                        Millions Of Consumers Use Free Edition To File Their Taxes
                        For Free ......................................................................................10

                2.      Free Edition Video Ads Sufficiently Disclosed Eligibility
                        Limitations .................................................................................10

                3.      Intuit's Website Adequately Discloses Free Edition's Eligibility
                        Limitations .................................................................................12

                4.      The FTC's Novemsky Survey Is Fundamentally Flawed, And
                        Scientific Consumer Testing Confirms That Intuit's Marketing
                        Is Not Deceptive .........................................................................15

                5.      Other Evidence Likewise Shows That Consumers Were Not
                        Deceived About Free Edition.......................................................17

                6.      Reasonable Consumers Do Not Believe Every Taxpayer
                        Qualifies For Free Edition ..........................................................18

                7.      Any Alleged Deception Is Cured Before The Point Of Sale .........19

        D.      The FTC's Requested Relief Is Beyond The Scope Of Its Allegations
                And Impermissibly Vague .......................................................................20

        E.      The Balance Of Equities Favors Denying The Injunction........................22

                1.      The FTC Waited Nearly Three Years To Seek An Injunction ......22

                2.      The Public Has No Interest In Enjoining Ceased Conduct............24

                3.      Consumers Would Be Harmed By An Injunction .........................25

IV.     CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Al Otro Lado v. Wolf*,
497 F. Supp. 3d 914 (S.D. Cal. 2020), *appeal pending*,
No. 20-56287 (9th Cir.) ........................................................................20

*Castagnola v. Hewlett-Packard Co.*,
2012 WL 2159385 (N.D. Cal. June 13, 2012)......................................13

*Castellanos v. Countrywide Bank NA*,
2015 WL 1906074 (N.D. Cal. Apr. 27, 2015) ........................................8

*Chapman v. Wells Fargo Bank, N.A.*,
2016 WL 3480784 (W.D. Wash. June 27, 2016).................................21

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) .......................................................14, 18

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021), *application denied*, 142 S. Ct. 1099 (2022)............7

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) .......................................................7, 21

*Dohrmann v. Intuit Inc.*,
823 F. App'x 482 (9th Cir. 2020) .........................................................13

*East Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019) ...............................................................8

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .................................................................8

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) .........................................................9, 18

*Estrella-Rosales v. Taco Bell Corp.*,
2020 WL 1685617 (D.N.J. Apr. 7, 2020) ......................................11, 12

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) ......................................................... 20-21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)...............................................................................20

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) ...............................................................................14

*FTC v. Affordable Media*,
    179 F.3d 1228 (9th Cir. 1999) ...........................................................................24

*FTC v. BF Labs Inc.*,
    2014 WL 7238080 (W.D. Mo. Dec. 12, 2014) .....................................................8

*FTC v. Boost Software, Inc.*,
    2014 WL 12461371 (S.D. Fla. Nov. 26, 2014)......................................................8

*FTC v. Cyberspace.Com LLC*,
    453 F.3d 1196 (9th Cir. 2006) .............................................................................9

*FTC v. DirecTV*,
    2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...........................11, 17, 19, 20

*FTC v. Gill*,
    265 F.3d 944 (9th Cir. 2001) ...............................................................................9

*FTC v. Inc21.com Corp.*,
    688 F. Supp. 2d 927 (N.D. Cal. 2010) ................................................................7

*FTC v. Infinity Grp. Servs.*,
    2009 WL 10670551 (C.D. Cal. Oct. 1, 2009).................................................7, 24

*FTC v. Lakhany*,
    2012 WL 12860115 (C.D. Cal. May 2, 2012) ....................................................24

*FTC v. Loewen*,
    2012 WL 4045207 (W.D. Wash. Sept. 13, 2012).................................................24

*FTC v. Merch. Servs. Direct, LLC*,
    2013 WL 4094394 (E.D. Wash. Aug. 13, 2013) ................................................8, 9

*FTC v. Neovi, Inc.*,
    598 F. Supp. 2d 1104 (S.D. Cal. 2008), *aff'd*,
    2010 WL 2365956 (9th Cir. June 15, 2010)....................................................21, 22

*FTC v. Sage Seminars, Inc.*,
    1995 WL 798938 (N.D. Cal. Nov. 2, 1995) .......................................................25

*FTC v. Shire ViroPharma*,
    917 F.3d 147 (3d. Cir. 2019).................................................................................9

*FTC v. Simeon Mgmt. Corp.*,
    391 F. Supp. 697 (N.D. Cal. 1975), *aff'd*, 532 F.2d 708 (9th Cir. 1976) ...............8

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
    415 U.S. 423 (1974)..........................................................................20, 22

*Harris v. Las Vegas Sands L.L.C.*,
    2013 WL 5291142 (C.D. Cal. Aug. 16, 2013)........................................19

*Heinz W. Kirchner*,
    63 F.T.C. 1282 (1963)..........................................................................18

*In re Telebrands Corp.*,
    140 F.T.C. 278 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006 ..................16

*In re Wilson*,
    442 F.3d 872 (5th Cir. 2006) ..............................................................23

*Kwan Software Eng'g, Inc. v. Foray Techs., Inc.*,
    2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........................................16

*Lavie v. Proter & Gamble Co.*,
    105 Cal. App. 4th 496 (Cal. Ct. App. 2003) ........................................13

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)..........................................................................20

*M2 Software, Inc. v. Madacy Ent.*,
    421 F.3d 1073 (9th cir. 2015) ........................................................ 15-16

*Methven & Assocs. Pro. Corp. v. Paradies-Stroud*,
    2014 WL 12611302 (N.D. Cal. Jan. 7, 2014)........................................7

*Mitchell v. Chavez*,
    2016 WL 6471400 (E.D. Cal. Nov. 1, 2016)........................................21

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)................................................................................7

*Muhammad v. California*,
    2020 WL 9848693 (C.D. Cal. Oct. 8, 2020)........................................22

*Nat'l Educ. Ass'n v. DeVos*,
    379 F. Supp. 3d 1001 (N.D. Cal. 2019) ..............................................23

*Nible v. CDCR*,
    2013 WL 5315171 (E.D. Cal. Sept. 20, 2013)....................................21

*Removatron Int'l Corp. v. FTC*,
    884 F.2d 1489 (9th Cir. 1989) ..........................................................9, 11

*Rodriguez v. Brown*,
    2016 WL 8673049 (E.D. Cal. Sept. 2, 2016)........................................................21

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*,
    2014 WL 5768752 (N.D. Cal. Nov. 5, 2014) .......................................................22

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*,
    907 F. Supp. 2d 1086 (N.D. Cal. 2012) ................................................................23

*Union Pac. R.R. Co. v. Mower*,
    219 F.3d 1069 (9th Cir. 2000) .......................................................................20, 21

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011).......................................................................18

*W. Watersheds Project v. Salazar*,
    692 F.3d 921 (9th Cir. 2012) ...............................................................................23

*Wangson Biotechnology Grp., Inc. v. Tan Tan Trading Co.*,
    2008 WL 4239155 (N.D. Cal. Sept. 11, 2008) ....................................................23

*Washington v. Hyatt Hotels Corp.*,
    2020 WL 3058118 (N.D. Ill. June 9, 2020)..........................................................19

**OTHER AUTHORITIES**

FTC Policy Statement on Deception, 103 F.T.C. 110 (Oct. 14, 1983)....................9, 17, 18

Wicks, Jan LeBlanc, et al., *Dual-Modality Disclaimers, Emotional Appeals, and
    Production Techniques in Food Advertising Airing During Programs Rated
    for Children: Is There a Godd Balance*, 38 J. Advert. 93 (2009).........................11

# SUMMARY OF ARGUMENT

The Court should deny the FTC's request for injunctive relief for at least four independent reasons.

*First*, there is no emergency warranting such relief. *See FTC v. Boost Software, Inc.*, 2014 WL 12461371, at *6 (S.D. Fla. Nov. 26, 2014). Intuit has already removed the challenged ads and, after April 18, will not run *any* ads until next year's tax season. By then, the FTC's administrative proceeding will have run its course. And the fact that the FTC delayed pursuing its investigation and bringing these claims for so long thoroughly belies any claim of any need for immediate relief.

*Second*, the FTC is unlikely to succeed on the merits because Intuit's marketing of TurboTax Free Edition was not deceptive. Approximately 14 million consumers use TurboTax Free Edition to file their taxes for free every year. The Free Edition ads disclosed in writing that "TurboTax Free Edition is for simple U.S. returns only" and invited consumers to "See if you qualify at turbotax.com." A voiceover likewise encouraged consumers to "see details at turbotax.com," which, in turn, disclosed Free Edition's qualifications on nearly every page. These multiple disclosures defeat any claim of deception. *See Freeman v. Time, Inc.*, 68 F.3d 285, 287, 289 (9th Cir. 1995); *FTC v. DirecTV*, 2018 WL 3911196, at *8 (N.D. Cal. Aug. 16, 2018); *Estrella-Rosales v. Taco Bell Corp.*, 2020 WL 1685617, at *2 (D.N.J. Apr. 7, 2020). The FTC's meager evidence on this point confirms that it has not carried its burden to show likelihood of success. Its sole consumer survey failed even to show consumers the allegedly offending ads, and therefore has no bearing on whether the ads were deceptive. In contrast, consumer testing conducted by Intuit's experts demonstrate that consumers were *not* deceived by Intuit's ads. Those conclusions are reinforced by TurboTax's high customer-satisfaction and retention rates. *See DirecTV*, 2018 WL 3911196, at *18 & n.17.

*Third*, the mandatory injunction to change Intuit's marketing practices that the FTC requests is overbroad and impermissibly vague. The proposed injunction would apply to

*all* Intuit products and subsidiaries, even though the allegations focus solely on TurboTax Free Edition.   The FTC has not remotely shown the extreme or very serious damage necessary to warrant an injunction changing the status quo—much less from products and subsidiaries about which the complaint say *nothing*.   Finally, the requested injunction is impermissibly vague, providing far too little guidance as to what actions would be required if it were entered.

*Fourth*, the balance of the equities weighs strongly in favor of denying the FTC's motion.   The FTC began its investigation nearly three years ago, and it has been nine months since it sent Intuit a draft complaint.   If there were a need for emergency relief, the FTC had ample time to seek it.   And as noted, Intuit no longer airs the challenged ads, it does not intend to use those ads or substantially similar ads in the future, and it will not air *any* ad for Free Edition until next tax season.   The public has no interest in enjoining conduct that has already stopped.   *See FTC v. Loewen*, 2012 WL 4045207, at *4 (W.D. Wash. Sept. 13, 2012).   Finally, an injunction one week before the April 18 federal tax-filing deadline would not only create chaos for Intuit's business operations, but also would threaten to confuse and harm the millions of consumers who file their taxes for free using Free Edition.

## I.    INTRODUCTION

Last year alone, nearly 14 *million* people filed their taxes for free using TurboTax Free Edition.[1]  For every one of those 14 million people, the product was genuinely free; they all used it to file their taxes without paying Intuit anything.  Free Edition thus provides obvious consumer benefit to taxpayers with simple tax returns.  Intuit offers this value for free so that if customers who use Free Edition later develop more complex financial situations and need filing software with additional capabilities, they will remember the good experiences they had with TurboTax and choose to use TurboTax's paid offerings. Intuit's business strategy thus depends not on any "bait and switch" scheme, but on the same approach used by American companies across industries for decades: developing life-long relationships with its customers by treating them fairly and providing them value.  It is critical to this approach (and to brand loyalty generally) that customers understand the eligibility requirements for the various commercial products—and they do understand, because the requirements are disclosed in Intuit ads and made plain in innumerable ways on its website.  We invite the Court to see for itself at turbotax.com.

Despite nearly three years of investigation, and waiting until the eleventh hour to file suit, the FTC failed to muster the evidence typical to prove likelihood of success on the merits in a consumer-deception case—hardly *any* consumer complaints (and none filed with the Court), *no* consumer declarations, and not even a survey where consumers were *shown* the allegedly offending ads.  The survey it proffers purports to test deception, but never shows respondents the ads themselves—and thus tests nothing relevant.  In contrast, although it is not Intuit's burden to prove anything, the declarations, exhibits, and expert evidence filed in response to this motion overwhelmingly show that consumers were not

---

[1]  The FTC's claim relates only to Intuit's advertising for its Free Edition, not its prior participation in the IRS Free File program, which was the subject of the *In re Intuit Free File Litigation* putative class action previously before this Court.  Intuit donated a version of its TurboTax software to that program until October 2021, when Intuit exited the program.  Compl. ¶ 73; *see also* Ryan Decl., Ex. H.  Because the FTC's claim has no relation to Free File, the complaint's numerous allegations concerning Free File have no bearing on the FTC's motion.

1    deceived.

2         Merits aside, an injunction should be denied because there is nothing remotely

3    approaching an emergency.  Had there ever been anything like the exigent harm to

4    consumers the FTC now claims, it could have brought its motion at any time since it sent

5    its draft complaint to Intuit nine months ago.  Moreover, even if there had been a need for

6    immediate relief, that time has passed because the ads have been taken down.  To be clear,

7    those ads were not deceptive; they made clear in text that Free Edition was for simple

8    returns only, instructed consumers to "See if you qualify at turbotax.com," and verbally

9    told people to "see details at turbotax.com," where Free Edition's qualifications were again

10   disclosed (repeatedly).  But the extraordinary relief being sought here is for a supposed

11   problem that does not exist.  The FTC apparently recognizes this, as it says that "without

12   an injunction, Intuit would be permitted to launch a similarly deceptive 'free' advertising

13   campaign *next* tax season."  Mot. 24 (emphasis added).  The possibility of conduct next

14   year cannot support an injunction today.  The administrative action the FTC filed will be

15   fully adjudicated by then, as a hearing is set for September 14, 2022.  And if more were

16   needed, the injunction the FTC proposes is patently unlawful, so sweeping and vague that

17   it encompasses products having nothing whatsoever to do with TurboTax or the FTC's

18   allegations.

19   **II.    BACKGROUND**

20       **A.    Factual Background**

21           **1.    TurboTax Free Edition**

22        Between Tax Years 2016 and 2020 (i.e., calendar years 2017 and 2021), nearly 70

23   million consumers used TurboTax Free Edition to file their taxes completely for free.  Ryan

24   Decl. ¶ 2.  Not a single taxpayer paid TurboTax to file their taxes using Free Edition.

25   Moreover, approximately one in five taxpayers who filed using *any* online tax-preparation

26   service (not just TurboTax) did so using Free Edition.  *See id.* ¶ 3; Gringer Decl. ¶ 13.  And

27   more consumers filed using Free Edition than any other single paid TurboTax product.

28   Ryan Decl. ¶ 3.  In total, between Tax Years 2018 and 2020, roughly 40% of TurboTax

1   customers filed their taxes for free using Free Edition—nearly the same proportion of

2   taxpayers in the general public who are eligible. *Id.*; Gringer Decl. ¶ 12. Free Edition can

3   be used for free by any of the approximately 47 million American taxpayers whose returns

4   can be filed on IRS Form 1040 without any attached schedules (or, before 2019, by using

5   IRS Form 1040EZ). *See* Gringer Decl. ¶ 12; Ryan Decl. ¶ 4; *see also* Compl. ¶¶ 20-25.

6           Intuit also offers paid TurboTax products for taxpayers with more complex tax

7   returns. Ryan Decl. ¶ 5. For instance, TurboTax Deluxe supports tax returns with itemized

8   deductions, while TurboTax Premier is needed to report income from selling stocks. *Id.*

9   When consumers visit TurboTax's website or mobile app, Intuit educates them about its

10  product lineup and encourages them to begin preparing their tax returns in the TurboTax

11  product capable of supporting their tax needs. *Id.*

12          Intuit offers a free product that builds goodwill with consumers and encourages

13  those hesitant to prepare their own tax returns to use Free Edition to do so. *See* GX 152 at

14  122:18-123:8, 124:17-23. Consistent with these objectives, Intuit seeks to raise awareness

15  about its free product, including through television advertisements. *See* Compl. ¶¶ 28-34.

16  Like those of many businesses, Intuit's ads often employ humor to attract consumers'

17  attention, for example, by repeating the word "free" in unanticipated circumstances. Ryan

18  Decl. ¶ 15. At the same time, Free Edition ads and marketing clearly disclose that not all

19  consumers qualify. *See id.* ¶¶ 18, 20 (detailing audio and text disclosures in Free Edition

20  video ads). The FTC itself recognizes this. *See, e.g.*, Compl. ¶ 35 ("Many of Intuit's ads

21  contain a fine print disclaimer at the end … informing consumers that the offer is limited

22  to consumers with 'simple tax returns' or 'simple U.S. returns only.'"); *id.* ¶ 37

23  (reproducing screen displayed to consumers during Free Edition television ads that ran in

24  2019, which states the free offer applies to the "Free Edition product only," is for "simple

25  U.S. returns," is "subject to change," and to "See details at turbotax.com"); *id.* ¶¶ 44, 47

26  (reproducing TurboTax home pages for Tax Years 2018 and 2019, each of which states

27  that "simple tax returns" can be filed for free and includes a hyperlink with the text "See

28  why it's free").

During Tax Year 2021, Intuit aired four video ads for Free Edition: a 30-second "Dog Show" commercial, a 15-second "Steven/Spit Take" commercial, a 30-second "Dance Workout" commercial, and a 30-second "Auctioneer" commercial.  Ryan Decl. ¶¶ 17-19.  Each repeated the word "free" numerous times.  *See* Compl. ¶¶ 2, 33.  Each stated prominently that it was an ad only for TurboTax Free Edition.  Each also included a verbal disclaimer that directed consumers to turbotax.com for additional information.  Ryan Decl. ¶¶ 18, 20.  And each concluded with text disclosures stating that "TurboTax Free Edition is for simple U.S. returns only" and "See if you qualify at turbotax.com."  *Id.*; Compl. ¶ 40.  The same text disclosures have been featured in every Free Edition advertisement since Tax Year 2019.  Ryan Decl. ¶ 20.  Despite these multiple disclosures, in response to the FTC's professed concerns, Intuit stopped running the ads.  *See infra* Part II.A.2.

Consumers must visit turbotax.com or the TurboTax app to begin using a TurboTax product.  When doing so, and before entering any information, consumers encounter additional information and disclosures regarding both Free Edition and TurboTax's paid products.  For example, on the TurboTax homepage, a color-contrasted, hyperlinked disclosure stating "Simple tax returns only" appears near any promotion of Free Edition.  *See* Ryan Decl. ¶¶ 7, 9; *see also* Compl. ¶ 49.  When users click that hyperlink, a pop-up screen informs them that "[a] simple tax return is Form 1040 only" and explains in detail the tax situations Free Edition covers.  Ryan Decl. ¶ 7.  Consumers who want to continue using a TurboTax product are shown a webpage with the suite of free and paid products.  The Free Edition portion of that page contains at least one, and up to three, color-contrasted, hyperlinked disclosures stating that Free Edition is for simple returns only.  *Id.* ¶ 10.  At various other points, the TurboTax website makes additional disclosures of Free Edition's qualifications.  *See id.* ¶¶ 11-12.

### 2.    Intuit's Decision To Stop Running The Challenged Advertisements

On March 24, 2022, after meeting with the FTC Chair and hearing her feedback,

1   Intuit decided to discontinue its video advertising campaign for Free Edition.  Ryan Decl.

2   ¶ 16.  Intuit immediately began the process of removing such ads from all media it controls,

3   which involved coordinating with over 100 partners.  *See id.* ¶¶ 16, 21-23.  As a result, by

4   March 28, approximately 95% of Free Edition television ads were off the air.  *Id.* ¶ 24.  An

5   additional 4% were removed by March 29, and the last 1% were off the air by April 1.  *Id.*

6   With respect to over-the-top television, full episode player content, online video, and social

7   media, most ads were removed by March 25, and the rest on March 28.  *Id.* ¶ 25.  Free

8   Edition ads also no longer appear on YouTube.  *Id.* ¶ 21.  In short, Intuit is no longer

9   distributing the video ads the FTC contends are unlawful and necessitate emergency relief.

10      Intuit informed the FTC on March 24 that it had decided to voluntarily "pull down

11  the 'free, free, free' TV ads for the remainder of the tax season" in response to the FTC's

12  concerns.  Gringer Decl., Ex. J.  And on March 28, Intuit confirmed with the FTC that it

13  had removed the ads, explaining that "95% of the free, free, free ads previously scheduled

14  to run ha[d] already been removed" from television broadcasts and online, and that "the

15  balance will be off the air by Friday."  Gringer Decl., Ex. K at 2.[2]  Intuit reminded the FTC

16  that it had "made the decision to remove the ads on … March 24 and immediately

17  communicated … that decision" to its advertising agencies.  *Id.*  Intuit further explained

18  that there was nothing it could do to have the remaining 5% of ads removed any sooner.

19  *Id.*  As noted, none of the ads are now running, and Intuit does not intend to use those ads

20  or substantially similar ads in the future.  Ryan Decl. ¶ 26.  And once the April 18 tax-

21  filing deadline passes, Intuit will not air any video ads for any TurboTax products until

22  next tax season, well after the September 14 administrative hearing.  *Id.*

23      **B.      The FTC's Investigation**

24      The FTC initiated its investigation in May 2019.  Gringer Decl. ¶ 5.  Over the next

25  several months, Intuit cooperated fully, providing hundreds of thousands of documents,

26  dozens of written interrogatory responses, and testimony from corporate representatives.

27  

28  [2]  Exhibit page numbers refer to the exhibit's internal pagination or, when internal
    pagination is missing, to the PDF page number.

1    *Id.* Intuit submitted its last response to the FTC's Civil Investigative Demands ("CID") in

2    November 2020.  *Id.* ¶ 7.  Intuit also submitted five white papers to address issues raised

3    during the investigation, the last of which was sent December 28, 2020. *Id.* ¶ 8.  Six months

4    later, on June 29, 2021, after an entire tax season had passed, the FTC sent Intuit a draft

5    complaint alleging that Intuit's marketing of Free Edition was deceptive.  *Id.* ¶ 9.  FTC

6    officials refused to discuss the merits of the allegations with Intuit.  *Id.*  Despite this, Intuit

7    sought in good faith to resolve the FTC's concerns and the parties were close to an

8    agreement on injunctive relief ahead of the current tax season.  But suddenly, the FTC

9    refused further discussions unless Intuit agreed to pay an exorbitant sum (even though the

10   FTC lacks authority to obtain monetary relief under Section 13(b)).  *Id.* ¶ 10.  It then waited

11   another nine months—three months into the current tax season—to file its complaint and

12   ask for "emergency" injunctive relief.  *Id.* ¶ 11.

13       **C.       The FTC's Complaint And TRO Motion**

14       The  FTC  alleges  that  Free  Edition  advertising  deceives  consumers  with

15   representations "that consumers can file their taxes for free using TurboTax," even though,

16   "in numerous instances," Intuit supposedly "does not permit consumers to file their taxes

17   for free using TurboTax."  Compl. ¶¶ 129, 130.  The complaint does not allege that any

18   consumer was ever charged to use Free Edition and in fact concedes that Free Edition is

19   free for tens of millions of Americans.  *Id.* ¶ 95.  It also acknowledges that Intuit's ads

20   contained disclaimers concerning Free Edition's qualifications.  *See id.* ¶¶ 35-41.

21       The complaint never mentions that Intuit has removed the challenged Free Edition

22   ads from all advertising channels.

23       The FTC's TRO motion seeks emergency injunctive relief, specifically, the

24   "[i]mmediate [e]ntry" of an injunction preventing Intuit "from misrepresenting that

25   consumers can file their taxes for free using TurboTax." Mot. 18-19. Again, *millions* use

26   Free Edition to file their taxes for free every year.  Ryan Decl. ¶¶ 2-4.

27       Notwithstanding its repeated claims that immediate, emergency relief is necessary,

28   the motion acknowledges (at 24) that Intuit informed the FTC that it was removing the

1   challenged ads.  The motion then suggests that "any purported take-down is not complete"

2   because "violative ads were still in the marketplace … as of March 28, 2022," *id.*, but does

3   not address Intuit's explanation for why a tiny fraction of the ads—through no fault of its

4   own—could not be taken down until April 1 but would be down as of that date.  The FTC

5   also says that "without an injunction, Intuit would be permitted to launch a similarly

6   deceptive 'free' advertising campaign *next* tax season."  *Id.* (emphasis added).  It fails to

7   note that its administrative complaint will be decided before there is any advertising for

8   next tax season.

9   **III.   ARGUMENT**

10          **A.      Legal Standards**

11          Preliminary injunctive relief is an "extraordinary" and "drastic" remedy.  *E.g.*,

12  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Moreover, because

13  temporary restraining orders are typically "restricted to serving their underlying purpose

14  of preserving the status quo," *Methven & Assocs. Pro. Corp. v. Paradies-Stroud*, 2014 WL

15  12611302, at *1 (N.D. Cal. Jan. 7, 2014), "mandatory injunctions"—as the FTC seeks—

16  "'are not granted unless extreme or very serious damage will result,'" *Doe v. Snyder*, 28

17  F.4th 103, 106 (9th Cir. 2022).

18          To obtain preliminary relief, the FTC must show (1) "a likelihood of success on the

19  merits" of its claim, and (2) "that the balance of equities weighs in favor of an injunction."

20  *FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 936 (N.D. Cal. 2010).  Alternatively, under

21  the Ninth Circuit's "sliding scale" approach, "a preliminary injunction can issue" when a

22  plaintiff shows "serious questions going to the merits" if "the balance of hardships tips

23  *sharply* in [plaintiff's] favor."  *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177

24  (9th Cir. 2021) (emphasis added), *application denied*, 142 S. Ct. 1099 (2022); *see also FTC

25  v. Infinity Grp. Servs.*, 2009 WL 10670551, at *4-7 (C.D. Cal. Oct. 1, 2009) (denying FTC

26  a preliminary injunction where it raised "serious questions going to the merits … rather

27  than a likelihood of success on the merits" and equities did not tip strongly in FTC's

28

1  favor).[3]

2          In balancing the equities, the FTC's stated interest in protecting consumers is not

3  dispositive.  *See FTC v. Simeon Mgmt. Corp.*, 391 F. Supp. 697, 707 (N.D. Cal. 1975),

4  *aff'd*, 532 F.2d 708 (9th Cir. 1976).  That "interest is present in every … case brought by

5  [the agency] and does not by itself justify an injunction."  *FTC v. BF Labs Inc.*, 2014 WL

6  7238080, at *5 (W.D. Mo. Dec. 12, 2014).  And potential harms to the party that would be

7  enjoined are entitled to considerable weight in the balancing, particularly where the FTC

8  has not clearly shown likely success on the merits.  *See Castellanos v. Countrywide Bank*

9  *NA*, 2015 WL 1906074, at *6 (N.D. Cal. Apr. 27, 2015) ("[T]he Court must … balance the

10  harms facing both Plaintiff and Defendants.");  *FTC v. Merch. Servs. Direct, LLC*, 2013

11  WL 4094394, at *4 (E.D. Wash. Aug. 13, 2013) (equities weighed in defendants' favor,

12  especially in light of the FTC's inadequate merits showing).  Finally, any injunction must

13  be both "narrowly tailored to remedy the specific harm shown," *East Bay Sanctuary*

14  *Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019), and "no more burdensome to the

15  defendant than necessary to provide complete relief to the plaintiffs," *East Bay Sanctuary*

16  *Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021).

17      **B.      There Is No "Emergency" Warranting Immediate Injunctive Relief
             Because Intuit Has Removed The Challenged Advertisements**
18

19          There is nothing remotely approaching an emergency here.  After waiting nearly a

20  year to sue, the FTC is seeking "emergency" relief for allegedly deceptive Free Edition ads

21  that Intuit has already stopped airing, *see* Ryan Decl. ¶¶ 21, 24-25.  The ads are not on

22  television, YouTube, or anywhere else controlled by Intuit.  *See id.*  Nor will any ads for

23  next season run before a decision on the FTC's administrative complaint.  *See id.* ¶ 26.

24          The fact that the challenged ads are no longer running, and thus there is nothing to

25  enjoin, by itself precludes injunctive relief.  *See FTC v. Boost Software, Inc.*, 2014 WL

26  12461371, at *6 (S.D. Fla. Nov. 26, 2014) (denying preliminary injunction because even

27

28  _____
    [3]  Intuit preserves for further review the argument that the Ninth Circuit's "sliding scale"
    case law is inconsistent with Supreme Court precedent and should be abrogated.

1   though the FTC had "established at least a likelihood of success on the merits," it "ha[d]

2   not clearly established that such practices [we]re likely to continue" during the litigation);

3   *Merch. Servs.*, 2013 WL 4094394, at *3 (denying preliminary injunction because "there

4   [was] little to suggest that the violations alleged in the FTC's Complaint [were] likely to

5   recur").  There is no possibility that consumers will "continue to suffer substantial injury,"

6   Compl. ¶ 135—assuming they ever had—from allegedly deceptive conduct that has ended.

7       **C.     The FTC Is Unlikely To Succeed On The Merits Because Intuit's**
          **Marketing Was Not Deceptive**

8

9       To succeed on the merits, the FTC must establish that Intuit's advertisements are

10  "likely to mislead consumers acting reasonably under the circumstances." *FTC v. Gill*, 265

11  F.3d 944, 950 (9th Cir. 2001); *see also* FTC Policy Statement on Deception, 103 F.T.C.

12  110, 174 (Oct. 14, 1983).  In assessing whether an ad is "likely to mislead," courts consider

13  its overall "net impression." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir.

14  2006).  Disclaimers or qualifications that are "sufficiently prominent and unambiguous"

15  can "change the apparent meaning of [a] claim[]" resulting in an ad that "leave[s] an

16  accurate impression." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989).

17  Courts also look to an ad's context, including advertising practices "commonplace in the

18  [relevant] market." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965-67 (9th Cir. 2016).

19      While the FTC's allegations span several years, for purposes of this motion the FTC

20  must show a likelihood of success on its *prospective* claims—that is, its claims of ongoing

21  harm or harm likely to recur.  *See FTC v. Shire ViroPharma*, 917 F.3d 147, 159 (3d. Cir.

22  2019); *Merch. Servs.*, 2013 WL 4094394, at *3.  As explained below, the FTC cannot make

23  this showing.  Despite nearly three years of investigation, the FTC offers none of the

24  evidence that would be expected in a consumer-deception case—hardly any consumer

25  complaints (and substantially less than would be expected if marketing for a product used

26  by millions were deceptive, Golder Decl. ¶ 103), no consumer declarations, and no survey

27  showing how consumers reacted to the allegedly offending ads.  If the Free Edition ads—

28  which were in use for four years—had deceived consumers, one would expect to see direct

1    evidence of it.  But the FTC has offered nothing of the sort.  In contrast, while it is not

2    Intuit's burden, the declarations, exhibits, and expert evidence cited herein

3    overwhelmingly demonstrate that consumers were not deceived.[4]

4         1.    **Intuit's Advertisements Of A "Free" Product Are Not False—
               Millions Of Consumers Use Free Edition To File Their Taxes
5               For Free**

6         Free Edition is free; and millions of taxpayers use it to file for free every year.

7    Roughly 47 million taxpayers file a "simple tax return"—one completed on IRS Form 1040

8    with no attached schedules—and are therefore eligible for Free Edition.  *See* Gringer Decl.

9    ¶ 12.  Between Tax Years 2016 and 2020, nearly 70 million taxpayers used Intuit's free

10   product.  Ryan Decl. ¶ 2.  All told, roughly one in five taxpayers who file using any online

11   service do so for free using Free Edition.  *See* Gringer Decl. ¶ 13.  And most people who

12   start in Free Edition end up filing for free.  *See* Ryan Decl. ¶ 13.  Given all this, the FTC

13   cannot seriously contend that Free Edition is falsely characterized as "free."  The only

14   question is whether Intuit's ads deceptively fail to disclose that Free Edition has

15   qualifications.  The FTC fails to show it will likely establish such deception.

16        2.    **Free Edition Video Ads Sufficiently Disclosed Eligibility
               Limitations**
17

18        Even without disclosures, Intuit's Free Edition ads truthfully marketed Free Edition

19   and were not deceptive.  But the disclosures in Intuit's video ads conclusively establish

20   that they are not deceptive.  For example, since Tax Year 2019, the ads have featured a text

21   disclosure stating "TurboTax Free Edition is for simple U.S. returns only" and inviting

22   consumers to "See if you qualify at turbotax.com."  Ryan Decl. ¶¶ 18, 20; *see also* Compl.

23   ¶ 40.  And Free Edition ads featured substantially similar disclosures in prior years.  *See*

24   Compl. ¶¶ 25, 37.  Intuit's recent video ads also included an audio disclosure directing

25   consumers to "see details at turbotax.com."  Ryan Decl. ¶ 18

26

27

28   ---
     [4]  The FTC filed 184 exhibits that are neither cited nor referenced in the TRO motion.  The
     massive volume of extraneous materials makes the omission of traditional species of
     consumer-deception evidence even more glaring.

These disclosures were "sufficiently prominent" to ensure that the advertisements left "an accurate impression." *Removatron*, 884 F.2d at 1497.  The text disclosures were set out in white font on a dark blue background, without accompanying images that might distract the viewer.  Courts have found that this type of disclosure renders ads not deceptive, even if the disclosure's text is "smaller than most of the text in the advertisement," *FTC v. DirecTV*, 2018 WL 3911196, at *8 (N.D. Cal. Aug. 16, 2018), or if the disclosure appears only "in the closing seconds of the commercial" and "toward the bottom of the screen," *Estrella-Rosales v. Taco Bell Corp.*, 2020 WL 1685617, at *2 (D.N.J. Apr. 7, 2020).  By including audio disclosures, moreover, Intuit went beyond most ads' disclosures.  *See* Wicks et al., *Dual-Modality Disclaimers, Emotional Appeals, and Production Techniques in Food Advertising Airing During Programs Rated for Children*, 38 J. Advert. 93, 99 (2009) (survey finding that 73% of all food ads with disclosures, and 94% of such ads directed at general and mature audiences, contained only text disclosures).  Those audio disclosures confirm that Intuit's ads were not deceptive.

Intuit's video disclosures were also "sufficiently … unambiguous" that the ads left "an accurate impression." *Removatron*, 884 F.2d at 1497.  The disclosures informed consumers that: (1) there is a "Free Edition," which itself indicates there are various versions of TurboTax products and that one is free while others cost money (which is reinforced by Intuit's ads for TurboTax's paid products); (2) there are qualifications to use Free Edition, such that not everyone will qualify; (3) the qualifications are tied to the complexity or simplicity of a consumer's tax returns; and (4) further information about those requirements is available online.

Contrary to the FTC's arguments, Intuit need not exhaustively list Free Edition's qualifications in its video ads.  The unmistakable message that qualifications exist, and the invitation to "[s]ee if you qualify at turbotax.com," adhered to common television-ad practices.  As Dartmouth Professor Peter Golder explains in his attached declaration, television ads routinely function "to direct potential customers to a place, such as a website, where they can get more information."  Golder Decl. ¶ 45.  Consumers accordingly do not

1    expect all relevant disclosures for a product to be in a television ad. *See id.* ¶ 47. Referring

2    consumers to Intuit's website for further information is especially reasonable here because

3    consumers *must* visit the website (or the TurboTax app) to use Free Edition. Case law

4    confirms that television disclosures need not be (and cannot reasonably be) 100% thorough.

5    *See, e.g.*, *Estrella-Rosales*, 2020 WL 1685617, at *2, 6 (disclosure that fast-food promotion

6    was available "[a]t participating locations for a limited time" and that "[p]rices may vary"

7    was "consistent with 'the norm of reasonable business practice'" in television advertising

8    and sufficient to put reasonable consumers on notice).

9        In any event, there is no merit to the FTC's contention that Intuit's reference to

10   "simple U.S. returns only" is inadequate because the FTC says "what 'simple' means can

11   be a matter of interpretation." Mot. 8-9. Intuit tells all who are interested *precisely* what

12   that means. *See infra* Part II.C.3. And the fact that most who *begin* using Free Edition

13   also *finish* there shows that consumers readily understand the qualifications. Moreover,

14   Intuit's competitors all tie eligibility for free tax filing to the simplicity of one's returns,

15   *see* Golder Decl. ¶ 31 & Figs. 4, 5, and California's Franchise Tax Board used the "simple

16   return" terminology to describe the scope of its own tax-filing service—which, like Free

17   Edition, was available only to individuals with straightforward returns that did not require

18   multiple forms, *see* Gringer Decl., Ex. C. Tellingly, the FTC never suggests what

19   disclosure *would* have met its standard. What is important is that Intuit's disclosures of

20   "simple returns only" and "see if you qualify" unmistakably informed consumers that the

21   product was not free for everyone, conclusively disproving their theory of deception.

22       **3.**     **Intuit's Website Adequately Discloses Free Edition's Eligibility**

23              **Limitations**

24        Intuit's video ads advise consumers to visit turbotax.com to learn more about Free

25   Edition and its scope. And as noted, consumers *must* visit the website or the TurboTax app

26   to use Free Edition. On the website (or the app), consumers encounter numerous clear,

27   conspicuous disclosures of Free Edition's eligibility limitations.

28        According to the FTC's own ".com Disclosures" guidelines for online advertising,

1    the factors that determine whether an online disclosure is clear and conspicuous include

2    "the placement of the disclosure in the advertisement and its proximity to the claim it is

3    qualifying; the prominence of the disclosure; whether the disclosure is unavoidable; … and

4    whether the language of the disclosure is understandable to the intended audience."

5    Gringer Decl., Ex. D at 7.  Case law reflects the same considerations.  *See Castagnola v.*

6    *Hewlett-Packard Co.*, 2012 WL 2159385, at *9-10 (N.D. Cal. June 13, 2012) (dismissing

7    claim under California's Unfair Competition Law where the defendant's webpage

8    "contain[ed] four references to the fact that there are 'Offer Details,'" and the referenced

9    "details" described the membership fee)[5]; *cf. Dohrmann v. Intuit Inc.*, 823 F. App'x 482,

10   484 (9th Cir. 2020) ("TurboTax's website … provided sufficient notice to a reasonably

11   prudent internet user" because "[t]he relevant warning language and hyperlink … were

12   conspicuous—they were the only text on the webpage in italics, were located directly

13   below the sign-in button, and the sign-in page was relatively uncluttered").

14       Consistent with the FTC's guidelines and case law, Intuit designed its website's

15   disclosures to be "direct and clear" and "unavoidable to consumers."  Ryan Decl., Ex. I at

16   7,8; *see also id*. Ex. J at 11 (Intuit advertising guidance providing that the "'Simple Tax

17   Returns' language must be unavoidable" and "included (in copy or as hyperlink) in close

18   proximity to mention of offer").  And Intuit succeeded:  Free Edition promotions on the

19   TurboTax homepage are accompanied, in close proximity, by a color-contrasted,

20   hyperlinked disclosure stating "For simple tax returns only."  *See* Ryan Decl. ¶ 9; *see also*

21   Compl. ¶ 49.  When users click on that hyperlinked disclosure, a pop-up screen informs

22   them that "[a] simple tax return is Form 1040 only" and provides a detailed explanation of

23   the situations Free Edition covers.  *See* Ryan Decl. ¶¶ 7, 9.  These disclosures match the

24   FTC's examples of acceptable hyperlinked disclosures.  *See, e.g.*, Gringer Decl., Ex. D at

25

26   _____

27   [5]   Because state laws routinely adopt or incorporate FTC standards when assessing
     consumer deception, *see, e.g.*, *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 507
28   (Cal. Ct. App. 2003) (noting that interpretation of the FTC Act was "more than ordinarily
     persuasive" in interpreting the California Unfair Competition Law), decisions applying
     state consumer-deception laws are instructive for applying the FTC Act.

1   A-8, A-13.

2       All versions of Intuit's product-list page likewise contain at least one color-

3   contrasted, hyperlinked disclosure stating that Free Edition is for simple returns only.  *See*

4   Ryan Decl. ¶ 10.   The most common version includes *three* such disclosures.   *See id*.

5   Moreover, every page of the TurboTax website includes a dropdown field providing

6   "Important offer details and disclosures" that includes yet another disclosure that Free

7   Edition is for simple tax returns only and again explains what is meant by that phrase.  *See*

8   *id*. ¶ 12.   The TurboTax website also includes blog posts and FAQs describing Free

9   Edition's eligibility criteria.  *See id*. ¶ 11.   Case law shows that ads bearing such repeated

10  disclosures are not, *as a matter of law*, deceptive.  *See Freeman v. Time, Inc.*, 68 F.3d 285,

11  287, 289 (9th Cir. 1995) (affirming dismissal of deceptive-advertising claim where

12  sweepstakes mailers "repeatedly state[d] the conditions which must be met in order to

13  win," "[n]one of the qualifying language [was] hidden or unreadably small," and "[t]he

14  qualifying language appear[ed] immediately next to the representations it qualifie[d]"); *see*

15  *also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) ("Given the

16  advertisement's legible disclaimer that '[o]ther restrictions may apply,' no reasonable

17  consumer could have believed that if an annual fee was not mentioned, it must not exist.").

18  If "other restrictions may apply" suffices as a matter of law, Intuit's far more detailed

19  descriptions surely do.

20      The FTC suggests that consumers are required to enter personal information on the

21  TurboTax website before they are told whether they are eligible for Free Edition.  *See* Mot.

22  1, 17-18.   But as just discussed, the TurboTax ads and website repeatedly disclose Free

23  Edition's qualifications before a consumer enters any personal information on the

24  TurboTax website.  *See* Golder Decl. ¶¶ 81-84.   And additional disclosures throughout the

25  tax-filing process make clear (again) that Free Edition is for simple returns only.

26      Put simply, Intuit's website ensures several times over that consumers are apprised

27  of Free Edition's qualifications; it "makes price points transparent, limits distracting factors

28  in the disclosure, and repeats the relevant disclosure as suggested by the FTC guidelines

and the academic literature."  Golder Decl. ¶ 82.  Anything more the FTC would like to add is not required.  Indeed, anything more could be counterproductive.  As Professor Golder explains, including additional information could "distract potential customers" and thus *impair* their ability to "understand and recall" the disclosure.  *Id.* ¶ 72.

### 4.    The FTC's Novemsky Survey Is Fundamentally Flawed, And Scientific Consumer Testing Confirms That Intuit's Marketing Is Not Deceptive

The survey conducted by Professor Nathan Novemsky that the FTC offers to meet its burden of proof is fundamentally flawed.  Most obviously, Novemsky did not show anyone the challenged ads, which means the survey cannot be used to draw any conclusions about them, Hauser Decl. ¶¶ 30-33, and the Court should therefore give the survey no weight.  Novemsky also designed his survey to generate the results he and the FTC wanted.  For example, he told participants that the survey was going to be used to support the FTC's deceptive-advertising claims against Intuit and allowed consumers to delete their submission once they learned of the survey's purpose.  *Id.* ¶ 54.  Professor Novemsky chose not to report the number of respondents who withdrew at that point, but it stands to reason that those who disagreed with its purpose would be so inclined.  It would be difficult to construct a more biased methodology.  And while Novemsky's declaration fails to provide any of his underlying data, making it impossible to verify much of anything he says, *id.* ¶ 68, other flaws are readily apparent.  For example, the survey failed to control for factors that might affect the results*, see id.* ¶¶ 34-39, and the questions themselves were misleading, encouraged speculation, and otherwise failed to test consumer deception accurately, *see id.* ¶¶ 40-48, 57-67.  Professor Novemsky's survey is thus both irrelevant to the ads at issue and not competent evidence on which to draw any conclusions.  Its failure to follow generally accepted principles would compel its exclusion at trial.  *See M2*

1    *Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087 (9th Cir. 2015).[6]

2           In contrast, Dr. John Hauser, the Kirin Professor of Marketing at the Massachusetts

3    Institute of Technology Sloan School of Management, conducted a survey establishing that

4    consumers do not rely on Intuit's ads and website alone, but instead conduct substantial

5    research when selecting a tax-preparation provider—and are likely to find third-party

6    websites discussing Free Edition's qualifications.  Hauser Decl. ¶¶ 69-77.  The survey also

7    showed that consumers are comfortable switching between tax-preparation providers and

8    that, as a result, consumers' decisions to use TurboTax reflect customer satisfaction, not

9    lock-in or deception.  *Id.* ¶¶ 85-89.

10          A different survey by Rebecca Kirk Fair, an expert the FTC has used on multiple

11   occasions, buttresses those conclusions.   Her survey confirms that consumers often

12   research tax-filing options and do not feel locked in to using a paid TurboTax product, even

13   after starting in Free Edition.  *See* Hauser Decl. ¶¶ 90-94.  Specifically, the survey showed

14   that consumers continue to select TurboTax products even if told about alternative tax-

15   filing options.  *Id.* ¶ 92.  And the FTC has long recognized that customer confusion rates

16   below 10%—like the 2-4% rates found by Kirk Fair's survey—are strong evidence that

17   there was no deception.  *See In re Telebrands Corp.*, 140 F.T.C. 278, 291, 320-21 (2005)

18   (finding a 3.9% misunderstanding rate not to indicate deception), *aff'd*, 457 F.3d 354 (4th

19   Cir. 2006).  Consumers' survey responses to Kirk Fair's open-ended questions likewise

20   indicate that consumers understand that they have other tax filing options, including free

21   alternatives.  *See id.* ¶ 93.  Simply put, the surveys confirm consumers were not deceived.

22

23   ───────────────────

     [6] If more were needed, the survey did not test the target population—identified as taxpayers
24   who were considering filing online but did not qualify for Free Edition.  *See* Hauser Decl.
     ¶¶ 49-55.  It surveyed only consumers who (by mid-March) had not yet filed their taxes,
25   which likely resulted in significant demographic discrepancies from the target population.
     *See id*. ¶ 50.  And the survey included consumers who do not file taxes for their household,
26   *see id*. ¶ 51, all further undermining the results, *see Kwan Software Eng'g, Inc. v. Foray
     Techs., Inc.*, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) (rejecting survey because
27   it did not show "that any of the members of the survey are the people who would see the
     alleged misrepresentations" or are those "whose decision to purchase the product could be
28   influenced").

### 5.   Other Evidence Likewise Shows That Consumers Were Not Deceived About Free Edition

TurboTax's high customer-satisfaction scores also undercut any notion of deceptive advertising here.  *See DirecTV*, 2018 WL 3911196, at *18.  Indeed, TurboTax consistently enjoys industry-leading customer-satisfaction rates.  *See* Ryan Decl., Ex. K at 7 (TurboTax online had a Net Promoter Score ("NPS") of 46, one of the highest in the industry); *id.* Ex. L at 2 (showing TurboTax with the highest 2019 NPS in the "Software & Apps" category).  Indeed, in *DirecTV*, the court relied in part on DirecTV's NPS of 34— lower than Intuit's—to conclude that the evidence did "not support a finding that the company violated the FTC Act."  2018 WL 3911196, at *18 & n.17.

High customer-retention rates, and the desire to retain customers, similarly suggest that a business has not behaved deceptively—a point the FTC elsewhere recognizes, *see* FTC Policy Statement on Deception, 103 F.T.C. at 181 ("There is little incentive for sellers to misrepresent (either by an explicit false statement or a deliberate false implied statement) in these circumstances since they normally would seek to encourage repeat purchases.").  That further undercuts the FTC's theory here.  Retaining customers is a critical component of Intuit's business model.  *See* Ryan Decl. ¶ 13; *see also* GX 150 at 120:20-121:12; GX 152 at 66:23-67:8; GX 155 at 213:7–214:1.  Intuit's efforts in this regard are manifest: Intuit maintains an overall customer-retention rate (including its paying customers) of approximately 80%—highest in the industry.  *See* Ryan Decl., Ex. M at 8.  Intuit's customer-retention rate is highest, moreover, among *paying* customers, *see id*. at 10, suggesting that those not eligible for Free Edition do not end up feeling deceived by TurboTax.

As Professor Golder concludes, "TurboTax has high customer satisfaction scores and above-average customer retention, … which indicate a lack of the negative feelings on the part of its customers that would typically be found if Intuit were deceiving its customers into believing that they could file for free."  Golder Decl. ¶ 19.  Indeed, if consumers were deceived as the FTC alleges, the FTC would almost certainly have been flooded with

complaints—yet the FTC identifies only 23 complaints from consumers who claimed to have seen a TurboTax ad, GX 301 ¶ 72. That only 23 consumers complained—out of the tens of millions who use TurboTax—is telling. *See* Golder ¶ 103.[7]

### 6. Reasonable Consumers Do Not Believe Every Taxpayer Qualifies For Free Edition

The context in which consumers view and understand TurboTax's ads further refutes any notion of deception. As the FTC has long recognized, "a company is not liable for every … conceivable misconception, however outlandish, to which [its] representations might be subject among the foolish." FTC Policy Statement on Deception, 103 F.T.C. at 178 (quoting *Heinz W. Kirchner*, 63 F.T.C. 1282, 1290 (1963)). Whether an ad is misleading is instead "judged by [its] effect … on a *reasonable* consumer." *Davis*, 691 F.3d at 1161-62 (emphasis added). And the reasonable-consumer inquiry is informed by common practice in the relevant market. *See Ebner*, 838 F.3d at 965-67 (affirming dismissal because no "reasonable consumer would be deceived" by representations so "commonplace in the [relevant] market").

Reasonable consumers are familiar with TurboTax's business model, further counseling against a finding of deception. As the IRS's independent auditor explained, Intuit and its competitors operate under a "Freemium business model," which is a "common, legal business practice[]" whereby companies offer a free commercial product with "fewer functions" and "prompt users to pay for the premium version with upgraded features." Gringer Decl., Ex. F, App. A at 26, 33. That model is "an entrenched part of the [electronic-tax-filing] market." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 46-48 (D.D.C. 2011) ("free product offers [have] long been a feature of the [e-filing] market," and are often "combined with paid products to earn revenue"). Indeed, all major

---

[7] Since the statistic itself is unhelpful to the FTC, Intuit accepts the FTC's representation that the complaints are as the FTC says; however, the FTC has not disclosed *any* of the supposed complaints. Moreover, the FTC's declaration appears to contain a typo and misstate that there were 571 complaints against Intuit. GX 301 ¶ 72. The declaration makes clear, however, that only 57 complaints were filed between November 1, 2021, and March 28, 2022, and that only 23 were from consumers that saw TurboTax advertising. *Id.*

1   players in the online tax-preparation industry use the so-called "freemium" model.  *See*

2   Golder Decl. ¶ 31.  Accordingly, no reasonable consumer expects that Free Edition (or

3   competitors' free tax-preparation products) may be used for all tax situations by all

4   taxpayers.

5        Moreover, reasonable consumers are intrinsically skeptical of "free" claims

6   because they understand that for-profit companies need to make money.  *See* Golder Decl.

7   ¶¶ 51-52, 54.  Consumers are thus likely to conduct research before using such products—

8   and even minimal research (i.e., before encountering the clear disclosures on the TurboTax

9   website) would confirm Free Edition's scope.  Numerous third-party websites, for

10  example, provide comparisons of offers from Intuit and its competitors.  *See* Gringer Decl.,

11  Exs. G, H, I; *see also* Hauser Decl. ¶ 73.

12        **7.    Any Alleged Deception Is Cured Before The Point Of Sale**

13        Even if Intuit's ads did not adequately disclose Free Edition's eligibility limitations,

14  the FTC concedes (Mot. 26) that consumers learn of any costs "prior to purchasing a paid

15  version of TurboTax."  That too precludes a finding of deception.  *See Washington v. Hyatt*

16  *Hotels Corp.*, 2020 WL 3058118, at *5 (N.D. Ill. June 9, 2020) (dismissing deceptive-

17  advertising claim where resort fees were not disclosed in advertising but were disclosed

18  during booking process); *Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142, at *2, *5-

19  6 (C.D. Cal. Aug. 16, 2013) (similar).

20        The FTC contends (Mot. 26) that Intuit's representations prior to the point of

21  purchase are nevertheless actionable as deceptive "door openers."  But a court in this

22  district recently explained why the "door opener" concept is inapplicable.  In *DirecTV*, the

23  FTC similarly alleged that "DIRECTV failed to adequately disclose in its advertising

24  certain terms of purchase for its satellite television services."  2018 WL 3911196 at *1.

25  The court explained that the "deceptive door opener" theory was "inapplicable" because

26  (1) "nothing in [the challenged advertisements] contradict[ed] the true terms of

27  DIRECTV's provision of services," and (2) "for a complex product like subscription

28  satellite television services, a reasonable consumer would understand the limitations of

1    how information is presented in a [space-constrained advertisement]." *Id*. at *15.  The

2    same reasoning applies here.  Nothing in the challenged ads contradicts the true terms of

3    Intuit's offer (that Free Edition is free for simple returns).  And for a complex product like

4    tax-preparation software, reasonable consumers understand the limitations of space-

5    constrained advertisements and where to look for additional information if they want to

6    learn more.[8]

7        **D.      The FTC's Requested Relief Is Beyond The Scope Of Its Allegations
                   And Impermissibly Vague**

8

9        The FTC impermissibly seeks relief that is both well beyond the scope of the

10   complaint's allegations and overly vague.  "[O]ne basic principle built into [Federal] Rule

11   [of Civil Procedure] 65 is that those against whom an injunction is issued should receive

12   fair and precisely drawn notice of what the injunction actually prohibits."  *Granny Goose*

13   *Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 444 (1974); *accord Union Pac. R.R. v.*

14   *Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000).  "Rule 65 requires that injunctions be specific

15   'so that those who must obey them will know what the court intends to require and what it

16   intends to forbid.'"  *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 924 (S.D. Cal. 2020),

17   *appeal pending*, No. 20-56287 (9th Cir.).

18       The relief requested here contravenes those standards.  First, the request is facially

19   overbroad.  The complaint focuses exclusively on Intuit's marketing for Free Edition (a

20   TurboTax product).  *E.g.*, Compl. ¶ 1.  Yet the requested relief is not limited to TurboTax.

21   Instead, the FTC's proposed order would apply to *all* Intuit products.  *See* ECF No. 28-1

22   at 4 (prohibiting Intuit from making certain representations "in connection with the

23   advertising, marketing, promoting, or offering for sale of *any* goods or service" (emphasis

24   added)).  An "overbroad injunction is an abuse of discretion," *Fraihat v. U.S. Immigr. &*

25

26   _____

27   [8]  The FTC is independently unlikely to succeed on the merits because its appointment of
     ALJs is unconstitutional, *see Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018); *Free Enter. Fund*
     *v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93, 513-14 (2010), and because its
28   structure and procedures—including commissioners insulated from executive removal—
     run afoul of separation of powers and due process.  *See Free Enters.*, 561 U.S. at 495.

1   *Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021), and courts routinely reject requests for

2   relief that exceed the scope of the complaint's allegations, *see Mitchell v. Chavez*, 2016

3   WL 6471400, at *2 (E.D. Cal. Nov. 1, 2016) (rejecting requested injunction because,

4   "[f]irst and foremost, [it] goes beyond the scope of the complaint"); *Chapman v. Wells*

5   *Fargo Bank, N.A.*, 2016 WL 3480784, at *1 (W.D. Wash. June 27, 2016); *Rodriguez v.*

6   *Brown*, 2016 WL 8673049, at *2 (E.D. Cal. Sept. 2, 2016); *Nible v. CDCR*, 2013 WL

7   5315171, at *1 (E.D. Cal. Sept. 20, 2013).  The same result is warranted here.

8       The FTC, moreover, not content with "simply maintaining the status quo"—the

9   traditional purpose of preliminary injunctive relief—asks the Court to mandate that Intuit

10  affirmatively "take action pending the determination of the case on its merits" by changing

11  its marketing, *Snyder*, 28 F.4th at 106.  As noted, "mandatory injunctions 'are not granted

12  unless extreme or very serious damage will result.'"  *Id.*  The FTC has made no such

13  showing.

14      The FTC's requested relief is also far too vague.  The FTC demands that Intuit be

15  enjoined from representing that its product is "free" unless the product is "free to all

16  consumers" or "[a]ll the terms, conditions and obligations … are set forth Clearly and

17  Conspicuously at the outset of the offer so as to leave no reasonable probability that the

18  terms of the offer might be misunderstood."  ECF No. 28-1 at 4.  Such a provision would

19  leave Intuit with virtually no guidance as to what "terms, conditions and obligations" must

20  be disclosed, or how.  Even assuming Intuit's Free Edition disclosures were deficient, the

21  proposed injunction does nothing to explain exactly what Intuit must do in order to

22  truthfully refer to Free Edition as "free."  The FTC demands that Intuit disclose "all" terms

23  in connection with any use of the word "free," and maintains that (notwithstanding its own

24  written guidance) it is insufficient to link to a disclosure.  But what this means in practice

25  is impossible to discern.  Would Intuit be required to reproduce the full contents of its

26  hyperlinked disclosure every time it mentions TurboTax Free Edition on its website?  That

27  would be unworkable.  This lack of specificity is fatal.  *See Mower*, 219 F.3d at 1077

28  (injunction vacated because "it was not crafted in sufficiently precise terms"); *FTC v.*

1    *Neovi, Inc.*, 598 F. Supp. 2d 1104, 1118 (S.D. Cal. 2008) (rejecting injunction "since it is

2    unspecific and overly vague"), *aff'd*, 2010 WL 2365956 (9th Cir. June 15, 2010).

3          Finally, the FTC seeks to enjoin Intuit from "misrepresenting or assisting others in

4    misrepresenting, expressly or by implication, any material fact, including … [t]he cost of

5    any of [Intuit's] goods or services, including any TurboTax product; and … [a]ny other

6    fact material to consumers concerning any good or service."   ECF No. 28-1 at 5.   That

7    request, too, is anything but "precisely drawn."  *Granny Goose Foods*, 415 U.S. at 444.   It

8    is just a vague directive that would require this Court to act as a regulator with respect to

9    virtually *all* of Intuit's representations as to *all* of its products—including, potentially,

10   products not at issue here.   The Court should deny the FTC's invitation to assume the role

11   of regulatory agency.  *See Neovi, Inc.*, 598 F. Supp. at 1118 (denying FTC's request for

12   injunction and refusing to act as "regulatory agency" overseeing defendant); *see also*

13   *Muhammad v. California*, 2020 WL 9848693, at *14 (C.D. Cal. Oct. 8, 2020) (injunction

14   sought was "insufficiently tailored to be enforceable" and did "not give notice of the

15   *specific* conduct to be enjoined"); *Rovio Ent. Ltd. v. Royal Plush Toys, Inc*., 2014 WL

16   5768752, at *2 (N.D. Cal. Nov. 5, 2014) (contempt motion denied because plaintiff "did

17   not propose an injunction specific in its terms, describing in reasonable detail the acts

18   sought to be restrained").

19          **E.      The Balance Of Equities Favors Denying The Injunction**

20          The FTC has not shown that the balance of the equities favors an injunction.

21          **1.      The FTC Waited Nearly Three Years To Seek An Injunction**

22          The FTC's lengthy delay in bringing this lawsuit belies its claim of exigency and

23   weighs strongly against preliminary relief.   If there were any urgency, it would be of the

24   FTC's own creation.

25          The complaint itself states (¶ 28) that the allegedly deceptive practices (public-

26   facing ads) have been widely known for at least six years.   The FTC began investigating

27   the challenged conduct nearly three years ago.   Gringer Decl. ¶ 5.   During that

28   investigation, the FTC regularly delayed action, allowing months to pass between

developments (for reasons unknown).  For instance, Intuit provided its final response to the FTC's CIDs in November 2020 and submitted the last of its five white papers addressing the FTC's professed concerns a month later. *Id*. ¶¶ 7-8.  The FTC then waited *six months* to send a draft complaint and proposed order to Intuit, *id.* ¶ 9—during which time an entire tax season passed.  The FTC waited another *nine months* to file the instant action, delaying until the height of tax season to do so. *Id.* ¶ 11.

The FTC's extensive delay precludes a request for injunctive relief now.  Equity does not reward parties for "delays of [their] own making." *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006); *accord W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (citing plaintiff's "delay" in seeking relief as one "equitable factor[]" supporting denial of preliminary injunction); *Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1027 (N.D. Cal. 2019) (agency lacked good cause to evade normal time constraints because "the time pressures faced by the Department were of its own making"); *Rovio Ent. Ltd. v. Royal Plush Toys, Inc*., 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012) (delay of six months weighed against issuing preliminary relief); *Wangson Biotechnology Grp., Inc. v. Tan Tan Trading Co*., 2008 WL 4239155, at *6 (N.D. Cal. Sept. 11, 2008) (delay of two months weighed against granting relief).  Had there been an emergency, and if consumers were being harmed, the FTC presumably would have acted swiftly before last tax season (or indeed the tax season before that).  Instead, it waited until nearly the end of this tax season to take any action.  In the face of this lengthy delay, the FTC offers no meaningful evidence that has not been available to it for over a year other than the survey conducted hastily last month, which did not even provide respondents the ads at issue.  The FTC's delay provides ample basis for denying the motion and undermines any argument that immediate relief is necessary to protect consumers.

On the other side of the ledger, a temporary restraining order with the purpose and effect of limiting Intuit's right to tell consumers of a free tax-filing option, entered just days before the tax deadline, would risk throwing Intuit's operations into chaos at the height of tax season.  And it would require Intuit to spend considerable time and expend substantial

1    resources to update its website, similar to its efforts to remove its Free Edition video ads.

2    *See* Ryan Decl. ¶ 14.  As explained, *see supra* Part III.D, that concern is especially acute

3    here given that the FTC's requested relief is overbroad and unspecific.

4              **2.       The Public Has No Interest In Enjoining Ceased Conduct**

5              Intuit *no longer airs* the challenged Free Edition advertisements.  *See supra* Part

6    II.A.2.  The FTC mostly ignores that inconvenient fact, making little effort to "explain how

7    enjoining [Intuit] from activities [it has] already ceased would further the public interest,"

8    *FTC v. Loewen*, 2012 WL 4045207, at *4 (W.D. Wash. Sept. 13, 2012).  In fact, because

9    the challenged ads are no longer being publicly disseminated by Intuit, there is no allegedly

10   deceptive advertising the Court *can* enjoin.  The lack of any ongoing conduct—and,

11   accordingly, the lack of any ongoing alleged harm to consumers—badly "weakens [the

12   FTC's] argument that the balance of equities tips in its favor."  *Id.*; *see also id.* (rejecting

13   FTC's argument that proposed TRO sought only "to prevent further violations of the FTC

14   Act" and holding that balance of equities tipped in Defendants' favor "without evidence of

15   *ongoing activity* affecting consumers" (emphasis added)); *FTC v. Lakhany*, 2012 WL

16   12860115, at *1 (C.D. Cal. May 2, 2012) (finding "minimal" hardship to FTC or public

17   where FTC had "not demonstrated that [the company was still] engaging in the wrongful

18   conduct at issue," as compared to "great" hardship to defendants from an injunction).

19             The FTC's invocation of the "voluntary cessation" doctrine (Mot. 24) is a red

20   herring.  That doctrine is an exception to *mootness*.  *See FTC v. Affordable Media*, 179

21   F.3d 1228, 1238 (9th Cir. 1999).  Intuit argues not that the action is moot (although it may

22   well be), but that the FTC has not shown it is entitled to emergency injunctive relief.  At

23   the very least, Intuit's decision to cease airing the challenged ads "militates against the

24   imposition of" preliminary injunctive relief.  *FTC v. Infinity Grp. Servs.*, 2009 WL

25   10670551, at *4 (C.D. Cal. Oct. 1, 2009).  Should the challenged conduct recur while this

26   action is pending, the FTC may seek injunctive relief at that time.  *See id.* (denying a

27   preliminary injunction "without prejudice to the FTC again seeking preliminary injunctive

28   relief during the pendency of this action if new evidence comes to light demonstrating that

Defendants have reentered the debt negotiation business and are offering similar services to those complained of").

Finally, the FTC's reliance on *FTC v. Sage Seminars, Inc.*, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995), is misplaced.  The evidence there overwhelmingly indicated that the allegedly deceptive advertising would recur, absent preliminary relief: one defendant, a corporate officer, had stated publicly that he had "no intention of changing [the corporation's] practices, notwithstanding the FTC's investigation," and the defendants presented "no evidence, other than the self-serving [officer's] declaration, to support their position that they no longer engage[d] in conduct proscribed by the FTC Act."  *Id.* at *6. The record here is not remotely comparable.  Intuit has shown that the allegedly deceptive advertising has been discontinued—a decision made and communicated to the FTC before it filed its complaint, *see* Gringer Decl., Exs. J & K—and the FTC has no contrary evidence.

### 3.   Consumers Would Be Harmed By An Injunction

An injunction before the April 18 tax-filing deadline would not only imperil Intuit's business, but also risk pulling the rug out from under consumers who, as the FTC acknowledges, "are hurriedly preparing to meet the Tax Day deadline."  Mot. 24.  The difficulty of complying with the proposed order, *see supra* Part III.D, much less doing so in the immediate future, would likely force Intuit to stop marketing or even referring to Free Edition, *see* Ryan Decl. ¶ 14.  That would likely prevent many of the millions of consumers who meet Free File's eligibility requirements from using the free product.  In short, the FTC's injunction would likely result in more consumers paying to file their taxes.

## IV.   CONCLUSION

The Court should deny the FTC's motion.


Dated:  April 4, 2022                         Respectfully submitted,

                                              By:*/s/ Sonal N. Mehta*
                                              Sonal N. Mehta (SBN: 222086)
                                              WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
                                              2600 El Camino Real, Suite 400

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Palo Alto, CA 94306
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100
Sonal.Mehta@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Howard M. Shapiro (*pro hac vice*
forthcoming)
Jonathan E. Paikin (*pro hac vice*)
Derek A. Woodman (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
Seth.Waxman@wilmerhale.com
Howard.Shapiro@wilmerhale.com
Jonathan.Paikin@wilmerhale.com
Derek.Woodman@wilmerhale.com

David Z. Gringer (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich St.
New York, NY 10007
Telephone:  (212) 230-8864
Facsimile:  (212) 230-8888
David.Gringer@wilmerhale.com

*Attorneys for Defendant Intuit Inc.*