Roberto Anguizola (IL Bar No. 6270874)
Frances Kern (MN Bar No. 395233)
Rebecca Plett (VA Bar No. 90988)
James Evans (VA Bar No. 83866)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-5201
Washington, DC 20580
(202) 326-3284 / ranguizola@ftc.gov
(202) 326-2391 / fkern@ftc.gov
(202) 326-3664 / rplett@ftc.gov
(202) 326-2026 / james.evans@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **Federal Trade Commission**, | No. 22-cv-1973-CRB |
| Plaintiff, | Hearing: April 21, 2022, 10:00 am, **or as soon as the matter may be heard** |
| v. | |
| **Intuit Inc.**, | **Plaintiff's Reply in Support of its Emergency Motion for Temporary Restraining Order and Preliminary Injunction** |
| Defendant. | |

1

**TABLE OF CONTENTS**

2    I.     Supplemental Facts .................................................................................................1

3           A.    Intuit's "Free" Claims Regarding Turbo Tax Are Ongoing ....................................1

4           B.    Expert Opinion Is in Favor of the FTC's Argument ..............................................2

5           C.    The FTC Pursued Its Investigation and Compromise Negotiations

6                 Diligently and Without Unnecessary Delay............................................................3

7    II.    Argument ................................................................................................................4

8           A.    The FTC Is Likely to Succeed on the Merits of Its Deception Claim ....................4

9                 1.    TurboTax Is Not Actually Free for Most Taxpayers ...................................5

10                2.    The Limitations Are Not Sufficiently Disclosed in Its Ads and

11                      Website........................................................................................................5

12                3.    High Customer Satisfaction and Retention are Not Indicia of Lack

13                      of Deception.................................................................................................8

14                4.    Many Consumers Have the Misimpression They Can Use

15                      TurboTax for Free ........................................................................................9

16                5.    Intuit's Deception Is a Deceptive Door-Opener.........................................10

17                6.    The FTC's Expert Conducted a Reliable Survey........................................11

18          B.    The Proposed Preliminary Injunctive Relief Is Necessary and Appropriate .........11

19          C.    The Equities Require Immediate Entry of a TRO...................................................14

20   III.   Conclusion ...........................................................................................................15

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2 **Cases**                                                                                    **Page(s)**

3 *FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ............................................ 14-15

4 *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989) ........................................................8

5 *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ........................................5

6 *FTC v. Connelly*, No. SACV 06-701, 2006 WL 6267337 (C.D. Cal. Dec. 20, 2006) ..............6, 10

7 *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ........................................................6

8 *FTC v. DirecTV*, No. 15-cv-01129, 2018 WL 3911196 (N.D. Ca. Aug. 16, 2018)....................8, 10

9 *FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999).........................................................................8

10 *FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) .....................................................................................8

11 *FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ....................................................6, 13

12 *FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015)................................................................. 8-9

13 *FTC v. Nat'l Lead Co.*, 352 U.S. 419 (1957) .................................................................................13

14 *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) .......................................................................13

15 *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994 (D. Nev. 2019)....................................................10

16 *FTC v. OMICS Grp. Inc.*, 827 F. App'x 653 (9th Cir. 2020) ........................................................10

17 *FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir.1994)....................................................................4

18 *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) .....................................13

19 *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th

20    Cir. 2008) .................................................................................................................................6

21 *FTC v. RagingBull.com, LLC*, 507 F. Supp. 3d 629 (D. Md. 2020) ........................................... 8-9

22 *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)...........................................................................13

23 *FTC v. Sage Seminars, Inc.*, No. C95-2854, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) ............15

24 *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ..............................................................4, 5, 8, 13

25 *FTC v. Sterling Drug*, 317 F.2d 669 (2d Cir. 1963) .......................................................................5

26 *FTC v. Vocational Guides, Inc.*, No. 3:01-0170, 2006 WL 3254517

27    (M.D. Tenn. Nov. 9, 2006) ..................................................................................................... 8-9

28 *FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995)................................................................... 8-9

*Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996) ...................................................................13

*Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000) .....................................................13

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*

      *Pharmaceuticals Co.*, 129 F. Supp. 2d 351 (D.N.J. 2000) ................................14

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) .........................................6

*Rebel Debutante LLC v. Forsythe Cosmetic Group, Ltd.*, 799 F. Supp. 2d 558

      (M.D.N.C. 2011) ...............................................................................................14

*Warner Bros. Entertainment v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910,

      2012 WL 6951315 (C.D. Cal. 2012) ................................................................14

**Statutes and Rules** **Page(s)**

5 U.S.C. § 552a ...............................................................................................................11

15 U.S.C. § 45 ...................................................................................................................4

15 U.S.C. § 53 .................................................................................................................13

16 C.F.R. § 251.1 ....................................................................................................... 12-13

**Other Authorities** **Page(s)**

FTC Statement on Deception, 103 F.T.C. 174 (1984) .................................................. 5, 6, 9-10

Fed. Trade Comm'n, ".com Disclosures: How to Make Effective Disclosures in Digital

      Advertising" (Mar. 2013), available at ftc.gov/business-guidance/resources/com-

      disclosures-how-make-effective-disclosures-digital-advertising....................................5, 8

# SUMMARY OF ARGUMENT

It is the peak of the tax season (between now and April 18), when most American taxpayers purchase tax preparation services like TurboTax. Intuit's deception of those consumers is ongoing and in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Millions of consumers will be selecting a tax preparation service in the coming days. For this reason, the Court should immediately halt Intuit's deceptive "free" TurboTax advertising campaign—all of it, not just what Intuit has selectively discontinued already—by entering the proposed TRO (Dkt. No. 28–1). The FTC respectfully requests that the Court do so based on the papers and without waiting to hold a hearing. The FTC's Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Mot.," Dkt. No. 28) is now fully briefed. The hearing on the FTC's motion is currently scheduled for April 21. This is several days after Tax Day and a significant amount of irreparable consumer injury could be prevented by entering a TRO before then. American taxpayers are the primary beneficiaries of this action. Even if the Court finds that the FTC delayed[*] in filing this motion for emergency relief, the Court should act immediately to protect the public as Intuit is unwilling or unable to fully self-correct.

Nothing in Intuit's Opposition to the FTC's Motion ("Opp.," Dkt. No. 45), changes this analysis. Intuit's assertion that it stopped running "the challenged advertisements" demonstrates Intuit's failure to understand what this case is about. Intuit argues that it has stopped running four commercials, and only four commercials. The FTC is not suing Intuit because a handful of cheeky TV ads said the word "free" too many times in thirty seconds. The FTC has brought this action because every time Intuit claims to consumers that something is "free," without a clear, conspicuous, and complete disclosure of the material limitations of that offer, it engages in deception. Whether the word "free" is used forty times in a television commercial or just once in

---

[*] As more fully explained below and in the Declaration of FTC Attorney James Evans, the FTC was diligent in fully investigating this matter and bringing this action. It also engaged in appropriate and complex compromise negotiations with Intuit which involved the participation of multiple state law enforcement agencies. Additionally, at its request, Intuit was granted an opportunity to fully engage with FTC staff handling this matter, Bureau of Consumer Protection leadership, including the Bureau Director, and each of the current Commissioners. The Commission engaged in a fulsome investigation and carefully deliberated before bringing this action amid a global pandemic.

1    a paid search advertisement, mobile ad, or website page, it is deceptive every time. And Intuit's

2    purported disclosures are not sufficient to cure this deception. Intuit cannot hide disclosures that

3    are an integral part of, and inseparable from, its "free" claims behind a hyperlink—they should

4    be placed immediately next to the claim, and should be sufficiently prominent so that the claim

5    and the disclosure are read at the same time, without referring the consumer somewhere else to

6    obtain this important information. Finally, the fact that many people do, in fact, use TurboTax for

7    free does not negate the fact that most taxpayers cannot do so. The evidence makes clear that

8    Intuit is deceiving consumers. The public interest in stopping deception should receive greater

9    weight than Intuit's claim that the TRO will "create chaos for Intuit's business operations," Opp.

10   at vii, when balancing the equities. The Court should enter the TRO as soon as is practicable.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      **REPLY IN SUPPORT OF FTC'S MOTION FOR TRO AND PI**

2    **I.    Supplemental Facts**

3          **A.    Intuit's "Free" Claims Regarding Turbo Tax Are Ongoing**

4          Intuit's deceptive "free" Turbo Tax advertising campaign is ongoing. While Intuit decided

5    to discontinue its video advertising for TurboTax Free Edition on March 24, 2022 (hours after

6    meeting with FTC Chair Lina Khan), Dkt. No. 45-3 (Ryan Dec.) ¶ 16, those video

7    advertisements continued to air well after March 24. In fact, Intuit's "Steven/Spit Take"

8    commercial, which includes deceptive "free" claims regarding TurboTax, aired during ABC's

9    primetime live broadcast of the Oscars on Sunday, March 27. GX 312 (Evans Dec.) ¶ 34. Intuit

10   planned to air this video commercial through March 31 and nothing seems to have altered that

11   plan. *See* Dkt. No. 45-3 (Ryan Dec.) ¶ 18.

12         Moreover, Intuit has made no commitment to discontinue its deceptive "free" claims

13   beyond a narrow set of video advertisements in its "free, free, free, free" campaign. As explained

14   in the FTCs' opening brief, Intuit's "free" advertising claims extend beyond video and involve a

15   variety of media including social media, online search ads, blogs, and websites. As described

16   more extensively in the Second Declaration of FTC Investigator Diana F. Shiller, Intuit continues

17   to make "free" claims through other advertising channels. GX 311 (2nd Shiller Dec.) ¶¶ 14–23.

18   This includes Spanish language claims offering TurboTax "GRATIS" that ran as recently as

19   March 31on the Spanish version of the TurboTax official website. *Id.* ¶ 32. Intuit also ran Internet

20   search ads containing "free" claims for TurboTax using search engines from at least March 31,

21   2022, through April 6, 2022. *Id.* ¶¶ 14–19. From at least March 30, 2022, through April 6, 2022,

22   Intuit also served mobile "free" ads through the Apple News application. *Id.* ¶¶ 14–15.

23         Intuit states that it "decided to discontinue its video advertising campaign for Free

24   Edition," "after meeting with the FTC Chair and hearing her feedback." Opp. at 4–5. Put another

25   way: 268 days after receiving a draft complaint alleging the ads were deceptive, and 22 days

26   after receiving a note from FTC staff expressing concern "that Intuit has renewed this ['free']

27   advertising campaign for the current tax season despite knowing of [FTC] staff's concerns," GX

28   312 (Evans Dec.) ¶ 31(b), Intuit's meeting with the FTC Chair may not have gone as well as

1  Intuit had hoped, and the company realized that the FTC would not wait to take action until after

2  the tax filing deadline—thus, in a cynical bid to avoid a TRO, Intuit scrambled to take down its

3  most egregious ads on the eve of being sued.

4  **B.    Expert Opinion Is in Favor of the FTC's Argument**

5  Intuit provided copious expert materials from Prof. John Hauser, Prof. Peter Golder, and

6  Rebecca Kirk Fair. These experts attacked Prof. Novemsky's Perception Survey and purported to

7  advance Intuit's theory that consumers were not deceived by its "free" marketing campaign. Dkt.

8  No. 45-5 (Hauser Dec.) & Dkt. No. 45-6 (Golder Dec.). However, the survey Prof. Novemsky

9  designed and supervised followed the appropriate scientific rigor and methodology. In designing

10  the Perception Survey, Prof. Novemsky had to contend with extensive preexisting consumer

11  impressions about whether or not TurboTax was free, likely a result of Intuit's pervasive

12  marketing. GX 313 (2nd Novemsky Dec.) ¶ 8. These preexisting impressions did not allow Prof.

13  Novemsky to perform a traditional control and stimulus copy test. *Id.* ¶ 9. Prof. Novemsky finds

14  other criticisms about the design of the survey and the survey questions similarly unpersuasive.

15  *Id.* ¶¶ 10-22. For example, Prof. Hauser's insistence that survey participants were guessing at

16  answers were not supported by evidence or the survey design (which repeatedly instructed

17  consumers not to guess at answers). *Id.* ¶¶ 10, 11, 18, 20. As described more extensively in the

18  Second Declaration of Nathan Novemsky (GX 313), Prof. Novemsky concludes that his survey

19  correctly reflected consumer perceptions about whether TurboTax is free for them. *See id.* ¶ 62.

20  Prof. Novemsky also identified significant flaws with the surveys and declarations

21  prepared by Intuit's experts. First, Profs. Hauser and Golder often mischaracterize the import of

22  survey results and other data to support their assertions, when data is either inconclusive or tends

23  to support the opposite of what they assert. *Id.* ¶¶ 32-36, 38, 44, 49, & 59. For example, the fact

24  that 30% of TurboTax users who logged into the product in 2019 did not file using TurboTax,

25  purportedly to show that consumers, after beginning to use TurboTax, are willing to switch to

26  other tax preparers, ignores that the vast majority, 70% of consumers, do complete filing their

27  taxes once they log in. *Id.* ¶ 32. Also, Prof. Hauser also appears to rely on his survey data about

28  consumers' willingness to switch tax filing products from one year to the next to draw

conclusions about consumers' willingness to do the same within a tax filing season after incurring sunk costs, a conclusion that does not follow from that data. *Id.* ¶ 33. Second, Prof. Hauser and Rebecca Kirk Fair's surveys suffer from several design flaws, *Id.* ¶¶ 13, 27, 31, & 37, e.g., asking consumers to remember what was important to them in making a decision months after consumers made such a decision. *Id.* ¶ 13. Finally, Prof. Hauser admits that he attempts to support conclusions in his declaration that his survey was not designed to support. *Id.* ¶ 32.

### C.     The FTC Pursued Its Investigation and Compromise Negotiations Diligently and Without Unnecessary Delay

Intuit's oft-repeated suggestion that the FTC dawdled in bringing an action against it, *see, e.g.*, Opp. at 1:16, 2:2–5, 6:10–12, 8:19–20, 22:21–23:24, is belied by the facts. The FTC's investigation of Intuit is among the most significant consumer protection investigations that the FTC has taken on in recent years. GX 312 (Evans Dec.) ¶ 11. A small but dedicated group of FTC staff have worked diligently on this matter for several years. *Id.* In its investigation, the FTC received and reviewed copious amounts of material submitted by Intuit and third parties. Submissions from Intuit included: 194 pages of written responses to FTC Civil Investigative Demands ("CIDs"); 67,017 documents—containing well over half a million pages—of document productions; eight days of Investigational Hearing testimony; and 540 pages of whitepapers, analyses, and reports. *Id.* ¶¶ 3(c), 14. The FTC also received and reviewed productions from third parties, including Google, which produced, among other things, 92 data files pertaining to TurboTax paid search advertising across fifteen Google AdWords accounts, comprising more than 7.8 gigabytes of data in more than 9.7 million rows of records. *Id.* ¶¶ 23–25. In addition to obtaining outside materials, the FTC undertook its own investigation of the TurboTax product and Intuit's marketing practices, as partially described in GX 301 (Shiller Dec.). *Id.* ¶¶ 3(g), 6(c), & 7(d). The FTC also worked with one or more experts and/or consultants to design and conduct consumer research through surveys and testing. *Id.* ¶¶ 3(f), 6(b), & 7(c).

Many other factors also affected the FTC's work. Over the course of much of the investigation and the compromise negotiations that followed, the FTC coordinated with multiple state partners, which required extensive, though privileged and confidential, consultation. *Id.*

¶¶ 5, 6(e), 7(e), & 11. Throughout most of the pendency of the matter, all involved also endured a global pandemic; among other things, Covid-19 significantly affected the pace of the FTC's consumer research efforts. *Id.* ¶ 10(a)–(h). In compromise negotiations, the FTC and states worked diligently to keep a large group of sovereigns coordinated, while at the same time Intuit, just one company, often took substantial time to engage—on one significant occasion, delaying 108 days to respond to a settlement draft while allowing the Tax Year 2021 filing season to begin. *Id.* ¶¶ 7(b), 11, & 29(s).

The investigation, an attempt at compromise, and the subsequent initiation of litigation proceeded without undue delay, while affording Intuit every opportunity to be heard in the decision-making process. *Id.* ¶ 10–11, 22, 29, & 30. If the FTC had sued Intuit six years ago, Opp. at 22, three years ago, *id.*, or nine months ago, *id.* at 2, Intuit would surely argue, equally vociferously, that the FTC had deprived it of an opportunity to be heard. The FTC proceeded as swiftly as possible under the circumstances to take necessary actions to protect consumers while affording Intuit due process, consistent with the FTC's statutory mandate and mission. *Id.* ¶ 11.

## II.   Argument

### A.   The FTC Is Likely to Succeed on the Merits of Its Deception Claim

Intuit's response fails to refute the FTC's likelihood of success on the merits of its deception claim. A defendant engages in deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), if it (1) made a representation, omission, or practice, (2) which was likely to mislead consumers acting reasonably under the circumstances, and (3) which was material. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). There is no dispute that Intuit has made "free" claims with regard to TurboTax. *E.g.*, Dkt. No. 45-3 (Ryan Dec.) ¶¶ 18–19 & GX 202, 204, & 208. The net impression of Intuit's "free" claims—that TurboTax is free—is likely to mislead consumers acting reasonably because, for the vast majority of consumers, it is not true. *See* Pl.'s Mot. for TRO & PI (Dkt. No. 28) at 12, n.62 (showing that about 2/3 of taxpayers in TY 2019 could not file for free with TurboTax); s*ee also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). Finally, Intuit's claim that the service is free is presumptively material, as it is a claim about the price of a product. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048,

1068 (C.D. Cal. 2012), *aff'd in part, vacated in part on other grounds*, 815 F.3d 594 (9th Cir. 2016). Thus, the FTC is likely to succeed on the merits of its deception claim.

### 1.   TurboTax Is Not Actually Free for Most Taxpayers

Intuit contends that its TurboTax marketing campaign is not deceptive because many taxpayers can file for free with TurboTax Free Edition. Opp. at 10. But TurboTax is not actually free for most taxpayers. The truth is that the vast majority of taxpayers—approximately two-thirds in TY 2019 (Mot. at 15, n.67)—are unable to file their taxes for free using TurboTax because they need to report income or wish to take tax credits or deductions that fall outside the scope of Intuit's ever-changing definition of "simple tax return." *See id.* at 5–6. "Deception may be found based on the 'net impression' created by a representation." *Stefanchik*, 559 F.3d at 928. In other words, when considering an advertisement, a court should examine "the entire mosaic, rather than each tile separately." *FTC Statement on Deception*, 103 F.T.C. 174, 179 (1984) (appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) (quoting *FTC v. Sterling Drug*, 317 F.2d 669, 674 (2d Cir. 1963)). The net impression of Intuit's marketing campaign is that TurboTax is free—and that is simply not true for most people.

### 2.   The Limitations Are Not Sufficiently Disclosed in Its Ads and Website

Intuit is mistaken when it argues the disclaimers in its ads cure its deceptive "free" claims and sufficiently disclose the limitations on TurboTax Free Edition. Opp. at 10–12. Disclaimers are not always effective and are not a defense, whereas here, the net impression is still misleading. First, no disclosure can cure a false claim—it "can only qualify or limit a claim to avoid a misleading impression." Fed. Trade Comm'n, ".com Disclosures: How to Make Effective Disclosures in Digital Advertising" (Mar. 2013), at 5, *available at* ftc.gov/business-guidance/resources/com-disclosures-how-make-effective-disclosures-digital-advertising[1]; *see also* FTC Policy Statement on Deception, 103 FTC at 180-81. If a disclosure "contradicts a material claim, the disclosure will not be sufficient," rather, "the claim itself must be modified." *Id.* at 5. And qualifications that clarify otherwise deceptive statements must be likely to come to the attention of the person who sees the basic claim; for that reason, small print or its equivalent

---

[1] For the Court's convenience, a copy is included as GX 316.

are unlikely to be effective. *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214, 1220-21 (D. Nev. 2011), *vacated in part on other grounds*, 763 F.3d 1094 (2014); Deception Policy Statement, 103 FTC at 180-81. Disclaimers must be "prominent and unambiguous to change the apparent meaning and leave an accurate impression… [a]nything less is only likely to cause confusion by creating contradictory double meanings." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989). Put another way, even truthful disclaimers can only be effective if they are clear and conspicuous. *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (fine print disclaimer no defense if net impression is still misleading); *FTC v. Connelly*, No. 6-CV-701, 2006 WL 6267337 at *10 (C.D. Cal. Dec. 20, 2006), *order clarified* 2007 WL 6492914 (C.D. Cal. Jan. 4, 2007) (disclaimers are particularly inadequate when they appear in a different context than the claims they purport to repudiate); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008) ("Defendants' inconspicuous small-font statement appearing just six times during the 30-minute infomercial that 'this product is not intended to diagnose, treat, cure or prevent disease' is wholly inadequate to change the net impression of the pain relief claims made in the infomercial."). Intuit's disclaimers are neither clear nor conspicuous and fail to correct the misimpression they leave with consumers.

**Intuit's disclaimers are unclear and misleading**. Intuit's disclaimers typically involve the use of the phrase "for simple tax returns only" or variation thereof. This phrase is confusing to consumers and misleads them. As Prof. Novemsky's survey shows, "a majority (55.0%) of Group A respondents (none of whom qualify for TurboTax Free Edition, and hence by definition do not have 'simple U.S. returns' according to Intuit's use of the term), are under the misimpression that their 2021 income tax return meets Intuit's definition of a 'simple U.S. return.'" GX 302 ¶ 30. Accordingly, many consumers do not understand that "simple tax return" is a term of art within the TurboTax universe. GX 302 (Novemsky Dec.), ¶¶ 29–34 & tbl. 3. This problem is exacerbated by the fact that what Intuit means by the term is an ever-shifting target. For example, consumers hit hard by the pandemic who received unemployment benefits in 2020 could report them for free using TurboTax last year, but this year, those same consumers are required to pay. *See* GX 301 (Shiller Dec.) ¶ 62 (providing that the TY 2020 definition is "Form

1     1040 only OR Form 1040 + Unemployment Income"), ¶ 65 (providing that the TY 2021

2     definition is "Form 1040 only").

3            **Intuit's disclaimers are not conspicuous.** In most instances, Intuit's "simple tax return"

4     disclaimers are not conspicuous. For example, in Intuit's television commercials, the disclaimer

5     is barely visible and sometimes gets mentioned quickly in a voice over. Accordingly, Intuit's

6     video disclaimers do nothing to cure the misimpression that TurboTax is free. The same problem

7     exists on the TurboTax website. A quick glance at the relative size of "Simple tax returns only"

8     on the TurboTax home page (which, in the report of Intuit's expert Prof. Golder, also showed a

9     large red "$0," "FREE" entirely in capital letters and in the largest font on the page, Dkt. No. 45-

10    6 at 33, Fig. 10) and products and pricing page (which, in the same report, also showed "FREE"

11    entirely in large, bold capital letters at the center of the page, just above three "$0" of about the

12    same size, "File for $0" in a teal button and in large text further down on the panel, *id.* at 36-37,

13    Figs. 13 & 14), compared to the prominent placement of numbers and words conveying "free"

14    claims contradicts the conclusion that the disclosure is conspicuous. The pages shout out "free"

15    from the rafters, while the disclosure timidly raises its hand in the back row. It is telling that,

16    although Prof. Golder points out that the hyperlinked disclosure appears multiple times on some

17    pages of the TurboTax website, he nevertheless circled those disclosures in red when reproducing

18    those webpages in his declaration. *Id.* at 32-39, ¶¶ 70-84, & Figs. 10, 13, 14.

19           While Intuit argues that its use of a "simple tax return" hyperlink complies with the

20    FTC's guides on .com Disclosures, Opp. at 12-14, it does not. To the contrary, it is inappropriate

21    for Intuit to communicate cost information that is integral to Intuit's "free" claim through a

22    hyperlink:

23                  Disclosures that are an *integral part of a claim* or inseparable from
24                  it should not be communicated through a hyperlink. Instead, they
                    should be placed on the same page and immediately next to the
25                  claim, and be sufficiently prominent so that the claim and the
                    disclosure are read at the same time, without referring the consumer
26                  somewhere else to obtain this important information. This is
27                  *particularly true for cost information* or certain health and safety

28

Reply re: Pl.'s Emergency Mot. for TRO & PI
No. 5:22-cv-1973-CRB

disclosures.

.com Disclosures at 10 (emphasis added).

### 3.   High Customer Satisfaction and Retention are Not Indicia of Lack of Deception

Intuit contends that its high "net promotor scores" ("NPS") and customer retention are evidence that consumers were not deceived. Dkt. No. 45–6 (Golder Dec.) ¶ 19, 105. However, rather than indicating lack of confusion, high customer satisfaction could exist in spite of initial confusion. GX 313 (2nd Novemsky Dec.) ¶ 58. For example, dissonance reduction (i.e., "I paid to use TurboTax, so I must have valued it") and high perceived switching costs could contribute to positive scores and retention rates. *Id.* Additionally, particularly when Intuit uses statements such as "[b]ased on what you told us about your tax situation, you'll need to upgrade" consumers may attribute unexpected costs to their own tax situation rather than Intuit's business practices. *Id.* ¶ 61. Further, "status quo bias" often means that for experiences that consumers associate with negative emotions, like tax filing, they are likely to maintain the status quo. *Id.* ¶ 59.

Intuit further relies on *FTC v. DirecTV*, No. 15-cv-01129, 2018 WL 3911196, at *18 (N.D. Ca. Aug. 16, 2018) to support its claim that high customer satisfaction shows a lack of deception. However, the existence of satisfied customers is not a defense under the FTC Act. *Stefanchik*, 559 F.3d at 929 n.12 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989)); *see also FTC v. Gill*, 71 F. Supp. 2d 1030, 1049 n.21 (C.D. Cal. 1999), *aff'd* 265 F.3d 944 (9th Cir. 2001) ("Even assuming that defendants do have thousands of satisfied consumers, it does not excuse their violation of the law").[2]

Moreover, even though Intuit points to what it calls "hardly any consumer complaints," Opp. at 1, "reasonable consumers may be misled even where some consumers claim to be satisfied with a service or only a few consumers actually complained." *FTC v. RagingBull.com,*

---

[2] Intuit cites to Section IV(C)(iii)(b)(2)(c) of the *DirecTV* order, even though all of Section IV(C)(iii)(b) of that order is dicta. In Section IV(C)(iii)(a), the court determined that exemplar advertisements put forward by the FTC and its expert were not deceptive. In Section IV(C)(iii)(b), the court stated only an alternative ground for a ruling it had already made. Accordingly, nothing in Section IV(C)(iii)(b) was necessary to support the court's order and was thus not something that merited further review on appeal.

1    *LLC*, 507 F. Supp. 3d 629, 634 (D. Md. 2020) (citing *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119

2    (D. Nev. 2015)); *FTC v. Voc. Guides, Inc.,* No. 3:01-0170, 2006 WL 3254517, at *14 (M.D.

3    Tenn. Nov. 9, 2006) (evidence of few consumer complaints does not rebut clear and convincing

4    evidence of misrepresentations); *FTC v. Wilcox*, 926 F. Supp. 1091, 1099 (S.D. Fla. 1995).

5              **4.       Many Consumers Have the Misimpression They Can Use TurboTax**

6                        **for Free**

7              Intuit argues that "consumers are familiar with TurboTax's business model," and that "no

8    reasonable consumer expects that Free Edition ... may be used for all tax situations by all

9    taxpayers." Opp. at 18–19. However, it is hard to see how Intuit's advertising created anything

10   but the net impression that consumers could use TurboTax for free. Intuit's style guide regarding

11   its free claims instructs employees to differentiate its product from others in the market and to

12   "[c]ommunicate that this offer is advantaged from other 'so-called' Free offerings because it is

13   truly $0," Dkt. No. 45-3 (Ryan Dec.) Ex. I, showing that Intuit intended consumers to believe

14   that its product was free. "An interpretation will be presumed reasonable if it is the one the

15   [advertiser] intended to convey." *FTC Statement on Deception*, 103 F.T.C. at 178. Further,

16   consumers are familiar with online tax products that *are* free for all tax situations and taxpayers,

17   for example Cash App Taxes, *see* Mot. at 9:17–19, and other business models offering online

18   products for free, *see* GX 302 (1st Novemsky Dec.) ¶ 27. Additionally, the FTC's survey

19   evidence shows that substantial numbers of consumers who cannot file for free using TurboTax

20   mistakenly think that they can. *Id.* ¶ 4.

21             Intuit further claims that consumers are "skeptical" of "free" claims, but that is

22   contradicted by its own data. For example, in 2019, 49% of consumers were not skeptical of

23   Intuit's free offerings. Dkt. No. 45–6 (Golder Dec.) ¶ 51. Moreover, Intuit has made efforts to

24   reduce consumer skepticism. As the FTC's expert noted: "Intuit has sought to increase

25   consumers' acceptance of its claim about a free online service by loudly and repeatedly making

26   the claim that filing is indeed free." GX 302 (1st Novemsky Dec.) ¶ 28. In fact, Intuit's "free"

27   claims are so convincing that even Intuit's explicit statements that consumers cannot use the free

28

1  version do not dispel consumer misperceptions about the claim.[3]

2  **5.      Intuit's Deception Is a Deceptive Door-Opener**

3  Intuit claims that consumers were not deceived because consumers were made aware of

4  the costs of its products before paying for the products. Opp. at 19. But it is well-established that

5  companies may not induce a first contact through deception, even if they subsequently cure the

6  deception. *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019), *aff'd* 827 F.

7  App'x 653 (9th Cir. 2020); *see also FTC Statement on Deception*, 103 F.T.C. at 180 & n.37.

8  Later disclaimers do not automatically exonerate deceptive behavior. *Connelly*, No. SACV 06-

9  701, 2006 WL 6267337, at *10.

10  Intuit's reliance on *DirecTV* is misplaced, as the facts are distinguishable. In *DirecTV*, the

11  court found that "for a complex product like subscription satellite television services, a

12  reasonable consumer would understand the limitations of how information is presented in a one-

13  or two-page flyer." *DirecTV*, 2018 WL 3911196, at *15. In contrast, while tax preparation itself

14  is complicated, the TurboTax offerings are not. TurboTax offers four options at different price

15  points, including a free version. *See, e.g.*, Dkt. No. 45–6 (Golder Dec.) fig. 6. Moreover, as

16  described in Part II.A.4, many consumers believe that they can use TurboTax for free, making

17  them less likely to expect limitations to Intuit's claims.

18  What is more, Intuit's entire strategy is to drive consumers to its website through its

19  "free" advertising without making fulsome disclosures about eligibility requirements. Dkt. No.

20  45–6 (Golder Dec.) ¶ 47 ("Such advertisements are not intended to provide comprehensive and

21  detailed descriptions of every taxpayer scenario."). Regardless of whether consumers later come

22  to learn of the true nature of Intuit's free offer, Intuit still induced the first contact through the

23  deceptive door opener. Particularly where consumers must conduct research outside of Intuit's

24  ecosystem to learn about the cost of the product, as contemplated by Prof. Hauser, Dkt. No. 45–5

25  (Hauser Dec.) ¶ 73, Intuit must not rely on consumer diligence to cure its misrepresentation.

26  Finally, Intuit's contention that consumers are cured of any deceptive impressions at the point of

27

28  [3] In the survey conducted by Rebecca Kirk Fair, when confronted with the screen Intuit uses to inform consumers they cannot use Free Edition, 28% of consumers still indicated that they would most likely select Free Edition. Dkt. No. 45–5 (Hauser Dec.) at PDF pg. 196.

1    sale ignores that consumers may have spent time and effort entering their tax information before

2    reaching that point. Even if consumers decide not to complete the transaction at the point of sale,

3    they will have wasted time and effort reaching that point. Mot. at 14:6–12 & n.70. The number of

4    consumers harmed in that way could be significant. For example, in tax years 2019 and 2020,

5    30% of consumers who logged in to TurboTax did not file using any Intuit product. Dkt. No. 45–

6    6 (Golder Dec.) ¶ 95.

###                6.        The FTC's Expert Conducted a Reliable Survey

8            As discussed in Section I.B, the FTC's expert conducted a reliable and rigorous survey.

9    Intuit's contention that his approach to the survey design (not showing consumers an ad) is

10   misplaced because, as Prof. Novemsky explains, pretesting revealed that consumers had existing

11   and well-developed impressions of whether or not they could file their taxes for free with

12   TurboTax. GX 313 (2nd Novemsky Dec.) ¶ 8. Because of this, using a control group was not

13   practical. *Id.* ¶ 9. Intuit's criticism that the survey disclosed its purpose at the end of the survey is

14   also flawed. First, the FTC was legally required to include such a disclosure by the Privacy Act,

15   5 U.S.C § 552a(e)(3). Second, the disclosure did not bias the survey, as is evident in the

16   additional sensitivity tables provided as GX 314 & 315. Prof. Novemsky further responds to

17   these and additional criticisms of his survey, including his question design, at length, finding

18   them unpersuasive. GX 313 (2nd Novemsky Dec.) ¶¶ 10-22. As discussed in Section I.B, the

19   declarations of Profs. Hauser and Golder and the surveys conducted by Prof. Hauser and

20   Rebecca Kirk Fair suffer several infirmities. *Id.* ¶¶ 13, 27, 31-38, 44, 49, & 59.

###        B.        The Proposed Preliminary Injunctive Relief Is Necessary and Appropriate

22           The proposed preliminary injunctive relief is necessary and appropriate to address Intuit's

23   ongoing deception. Intuit either misunderstands the scope of the advertising challenged by the

24   FTC or misstates the facts when it argues that "the challenged ads are no longer running, and

25   thus there is nothing to enjoin." Opp. at 8. As discussed above in Section I.A. and in GX 311, the

26   Second Declaration of FTC Investigator Diana Shiller, Intuit's deceptive "free" TurboTax

27   advertising is ongoing and extends beyond Intuit's "free, free, free, free" video and television

28   advertisements that it has decided to pull. Even if the court trusts Intuit when it states it "has no

1    intention of ever using any other video ads that … rely on the repetition of the word 'free,'" Opp.

2    at 5, Intuit is continuing to use other advertising channels, including social media, search ads,

3    and its website, to deceptively claim that TurboTax is "free." GX 311 (2nd Shiller Dec.) ¶¶ 14–

4    32. The fact that the current ads repeat the word "free" less frequently or use "$0" or the Spanish

5    "Gratis" instead is of no moment and does not change the net impression they leave with

6    consumers: TurboTax is free for them. And like the "free, free, free, free" television ads, Intuit's

7    ongoing ads fail to adequately disclose all the terms, conditions and obligations upon which

8    receipt of the "free" TurboTax online tax preparation services are contingent. Like Intuit's "free,

9    free, free, free" television ads, the ongoing ads include the phrase "Simple tax returns only."

10   However, as explained in the FTC's opening brief, Mot. at 5:2–6:4, 8:7–9:8, 11:16–12:1, 12:16–

11   13:3 & n.63, the phrase "Simple tax returns only" is misleading and confusing to consumers and

12   fails to adequately disclose the truth: TurboTax is not free for most consumers.

13       Without an injunction, Intuit will be free to continue deceiving consumers between now

14   and Tax Day (the peak of the tax season). Intuit will be free to continue deceiving consumers

15   with "free" claims after Tax Day when it starts selling, advertising and promoting TurboTax as a

16   solution for consumers that miss the tax deadline.[4] And TurboTax will be free to continue

17   deceiving consumers with "free" claims next tax season. And as explained in the FTC's opening

18   brief, voluntary cessation does not obviate the need for a preliminary injunctive relief especially

19   where, as here, Intuit only partially ceased its deceptive advertising after it became clear that an

20   enforcement action was imminent. Mot. Part II.C.

21       Intuit is mistaken when it argues the proposed TRO is "beyond the scope of the

22   complaint's allegations and overly vague." Opp. at 20. The scope of the Complaint is Intuit's

23   deceptive "free" advertising claims, and this is precisely the misconduct the proposed TRO

24   addresses and prohibits. In fact, the proposed TRO tracks the Commission's guidance in its

25   *Guide Concerning Use of the Word "Free" And Similar Representations*, 16 C.F.R. § 251 et seq.,

26

27

28

---

[4] *See e.g.*, TurboTax Blog, "Did You Miss the Tax Deadline? 3 Steps You Can Take Next," *available at* blog.turbotax.intuit.com/tax-planning-2/did-you-miss-the-tax-deadline-3-steps-you-can-take-next-19629/amp/ (last visited Apr. 6, 2022).

which has been in place since November 10, 1971.[5] The fact the proposed TRO covers Intuit's potential deceptive advertising and marketing of products and services beyond TurboTax is appropriate. Given its ongoing deception, why should Intuit be able to make similar deceptive "free" claims for a different product or service? As the courts have held repeatedly, the FTC "'is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.'" *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)). "And those 'caught violating' the FTC Act 'must expect some fencing in.'" *Grant Connect, LLC*, 763 F.3d at 1105 (quoting *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957)).

Intuit is also mistaken when it characterizes the proposed TRO, which prohibits Intuit from misrepresenting its products or services as "free," as a "mandatory injunction," arguing that it is not expressly authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Opp. at 21:8–9. The proposed TRO is a prohibitory injunction that "'forbids or restrains an act.'" *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010) (quoting *Black's Law Dictionary* 855 (9th ed. 2009)). The fact that the proposed TRO contains an exception (allowing Intuit to represent goods or services as "free" even where they are not free for all consumers if it clearly and conspicuously discloses all the relevant terms, conditions, and obligations) "does not convert it from a prohibitory to a mandatory injunction." *Neovi*, 604 F.3d at 1159. Moreover, the court has the authority to grant both mandatory and prohibitory injunctions under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).[6]

---

[5] *Compare* Proposed TRO section I and Guide Concerning Use of the Word "Free" and Similar Representations 16 C.F.R. 251.1(c) ("[C]onditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood.")

[6] The terms "enjoin" and "injunction," both found in the relevant part of Section 13(b), 15 U.S.C. § 53(b), encompass orders commanding or preventing an action. *Black's Law Dictionary* 800 (8th ed. 2004); *see Gilmore v. California*, 220 F.3d 987, 1001 (9th Cir. 2000) ("'when a decree commands or prohibits conduct, it is called an injunction'" (quoting *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996))). For this reason, in cases brought by the FTC, courts routinely grant mandatory injunctions. *See, e.g., Stefanchik*, 559 F.3d 924 (affirming order that required the defendants to maintain records, file reports, and deliver the court's order to employees); *Gill*, 71 F. Supp. 2d 1030 (ordering defendants, inter alia, to notify all their clients that their contracts were rescinded); *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) (affirming order that required a receiver to manage an interest-bearing redress account, and

1      **C.      The Equities Require Immediate Entry of a TRO**

2          "[W]hen a district court balances the hardships of the public interest against a private

3      interest, the public interest should receive greater weight." *FTC v. Affordable Media, LLC*, 179

4      F.3d 1236 (9th Cir. 1999). Intuit argues that this case merits an exception to this rule because:

5      (1) the FTC waited too long, (2) the public has no interest, and (3) consumers would be harmed

6      by an injunction. None of these factors impedes this Court's entry of a TRO as soon as possible.

7          *First*, the FTC's investigation, attempt at compromise, and subsequent initiation of

8      litigation proceeded without undue delay, while affording Intuit every opportunity to be heard.

9      *See supra* Part I.C. Courts routinely grant preliminary injunctive relief even after parties have

10     taken time to investigate claims and pursue settlement opportunities. *See Warner Bros.*

11     *Entertainment v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 1927, 2012 WL 6951315 (C.D. Cal.

12     2012), *aff'd* 544 Fed. App'x 683 (9th Cir. 2013) ("In the Ninth Circuit, a delay of several months

13     that gives the plaintiff an opportunity to investigate its claim and attempt to resolve the dispute

14     out of court is not unreasonable such that injunctive relief should be denied on that ground

15     alone." (citing cases)).[7] The length of time between opening the FTC's investigation and filing

16     this action is justified by the comprehensive nature of the FTC's investigation, the FTC's

17     substantial coordination with state partners, the volume of material Intuit produced, and Intuit's

18     delays in settlement negotiations (particularly between November 2021 and February 2022,

19     allowing the Tax Year 2021 filing season to open without responding to settlement offer), not to

20     mention the pandemic. *See supra* Part I.C. Any delays in this process were not delays of the

21     FTC's making.

22         At the same time, Intuit argues that a TRO compelling it to stop deceiving consumers

23     "would risk throwing Intuit's operations into chaos at the height of tax season." Opp. at 23. This

24

25     required defendants to permit Commission employees to access their offices, and to file reports).
          [7] *See also, e.g.*, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*
26     *Pharms. Co.*, 129 F. Supp. 2d 351, 368 (D.N.J. 2000), *judgment aff'd* 290 F.3d 578 (3d Cir.
       2002) ("The court finds that [plaintiff's] good faith efforts to investigate the facts and pursue
27     remedies outside of litigation do not undermine [plaintiff's] claim of irreparable harm."); *Rebel*
       *Debutante LLC v. Forsythe Cosmetic Grp.*, 799 F. Supp. 2d 558, 580 (M.D.N.C. 2011)
28     ("Balanced against a delay in seeking injunctive relief, however, is the goal of voluntary
       resolution of disputes without the need for litigation.").

takes the axiom from *Affordable Media* and flips it on its head. It is precisely because we are "at the height of tax season" that the Court should act immediately to stop Intuit's deception. The fact that a TRO "would require Intuit to spend considerable time and expend substantial resources to update its website," Opp. at 23–24, to stop deceiving consumers, is a problem of Intuit's own making. The suggestion that Intuit should be allowed to keep using deceptive tactics through the end of tax filing season because it would be hard to stop is an argument *for* a TRO, not against it. Even if the Court finds that the FTC delayed in filing the Motion for a TRO, American taxpayers are the primary beneficiaries of this action, and they played no role in any delay. The Court should act immediately to protect the public.

*Second*, contrary to Intuit's argument, its conduct has not ceased. *See supra* Parts I.A & II.B. Intuit continues to grossly underestimate what constitutes "the challenged Free Edition advertisements," Opp. at 24:5. Where "there is evidence in the record that as recently as [this week], defendant[] ha[s] continued to run [its] deceptive advertisements," a TRO is appropriate. *FTC v. Sage Seminars, Inc.*, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995). Intuit's claim to have taken down the worst of its "free" ads after hearing feedback from the FTC Chair, Opp. at 4–5, is belied by the fact that 268 days earlier, it received a draft complaint alleging that the ads were deceptive, and 22 days earlier it received a note from FTC staff expressing concern about the ads. GX 312 (Evans Dec.) ¶ 31(b). Intuit's take-down of certain ads is more properly characterized as a last-ditch attempt to avoid an FTC suit and a cynical bid to avoid a TRO.

*Third*, Intuit's suggestion that a TRO would harm consumers because it would "force Intuit to stop marketing … Free Edition" is an argument that consumers are better off being deceived because some of them do end up filing for free with TurboTax, and they might end up paying for tax services elsewhere. The problem is that they might pay Intuit for TurboTax services if Intuit's deception is not stopped. Intuit should not be allowed to profit by deceiving consumers just because one-third of them can actually use a product advertised as "free" for free. This argument also concedes that Intuit is still marketing Free Edition, as the FTC has shown.

## III.   Conclusion

For these reasons, Plaintiff respectfully requests that the Court issue a TRO and PI.

1

2

3    Dated: April 8, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,


/s/ Roberto Anguizola
Roberto Anguizola, IL Bar No. 6270874
Frances Kern, MN Bar No. 395233
Rebecca Plett, VA Bar No. 90988
James Evans, VA Bar No. 83866
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-5201
Washington, DC 20580
(202) 326-3284 / ranguizola@ftc.gov
(202) 326-2391 / fkern@ftc.gov
(202) 326-3664 / rplett@ftc.gov
(202) 326-2026 / james.evans@ftc.gov
(202) 326-3395 (fax)

Attorneys for Plaintiff
Federal Trade Commission