**Pages 1 - 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

FEDERAL TRADE COMMISSION,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )        **NO. C 22-01973 CRB**
                               )
INTUIT, INC.,                  )
                               )
            Defendant.         )
_____)

                        San Francisco, California
                        Thursday, April 21, 2022

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        FEDERAL TRADE COMMISSION
                        Bureau of Consumer Protection,
                        Division of Marketing Practices, CC 8602
                        Org Code 1144, Mailstop CC-5201
                        600 Pennsylvania Avenue, NW
                        Washington, D.C.  20580
                   BY:  **ROBERTO ANGUIZOLA, ATTORNEY AT LAW**
                        **JAMES E. EVANS, ATTORNEY AT LAW**

For Defendant:
                        WILMER, CUTLER, PICKERING, HALE
                        & DORR LLP
                        1875 Pennsylvania Ave., NW
                        Washington, D.C.  20006
                   BY:  **SETH P. WAXMAN, ATTORNEY AT LAW**
                        **JONATHAN E. PAIKIN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                United States District Court - Official Reporter

```
 1   APPEARANCES:   (CONT'D)

 2   For the Defendant:
                         WILMER, CUTLER, PICKERING, HALE
 3                       & DORR LLP
                         7 World Trade Center
 4                       250 Greenwich Street
                         New York, New York  10007
 5               BY:   DAVID Z. GRINGER, ATTORNEY AT LAW

 6
                         WILMER, CUTLER, PICKERING, HALE
 7                       & DORR LLP
                         2600 El Camino Real - Suite 400
 8                       Palo Alto, California  94306
                 BY:   SONAL N. MEHTA, ATTORNEY AT LAW
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

<u>Thursday - April 21, 2022</u>                                        <u>10:25 a.m.</u>

                          P R O C E E D I N G S

                              ---oOo---

        THE CLERK:  Court is now in session.  The Honorable

Charles R. Breyer is presiding.  You may be seated.

    Our court reporter can't be in two places at once.

        THE COURT:  She can't?

        THE CLERK:  She is appearing by phone.  She went from

Zoom to phone.

        THE COURT:  Apparently we don't have an in-person

court reporter, but we have a remote court reporter.  We will

see how remote it is in a minute.

    But I would appreciate if the parties, when they address

the Court or each other, identify themselves and so we will

have a record of it.

    Why are all the lights out in this courtroom?  What is

going on?

        THE CLERK:  I think it's for effect because it was a

little too bright.

        THE COURT:  I like a little sunshine.  Sunshine in the

judicial process, isn't that -- doesn't that just make

everyone's day?

        THE CLERK:  Okay, let me call the case, Judge.

        THE COURT:  Apparently I'm like an airline.  Masks are

optional, so I leave it up to you.  Except if you are not

**PROCEEDINGS**

1    vaccinated, please wear a mask.

2        **THE CLERK:**  Calling civil action C22-1973 Federal

3    Trade Commission versus Intuit, Inc.

4        Counsel, please state your appearances in the microphone

5    for the Court.  Thank you.

6        **MR. ANGUIZOLA:**  Good morning, Your Honor, I am Roberto

7    Anguizola on behalf of the Federal Trade Commission, and with

8    me is co-counsel James Evans.

9        **THE COURT:**  Good morning.

10       **MR. WAXMAN:**  Good morning, Your Honor, I'm Seth Waxman

11   representing Intuit.  And with me at counsel table are my

12   colleagues Sonal Mehta, David Gringer and Jonathan Paikin.

13       **THE COURT:**  Good morning.  And Counsel can remain

14   seated unless you want to come up to the podium.  Not

15   necessary.  But make sure your remarks are before a microphone.

16       So this matter is on based upon the FTC's request for

17   injunctive relief, and it was initially filed -- well, I don't

18   have the date of its filing -- but about two weeks ago; is that

19   correct?

20       **MR. ANGUIZOLA:**  March 28th, Your Honor.

21       **THE COURT:**  March 28th.  And it was assigned at that

22   time to Judge Davila that related to this Court.

23       And the question -- the initial question was when to

24   conduct the hearing on the proposed injunctive relief.

25       The hearing I think was scheduled -- originally scheduled

**PROCEEDINGS**

1   for April 18th; is that right or am I off on that?

2         MR. ANGUIZOLA:  It was originally scheduled for

3   March -- no, April 14th.

4         THE COURT:  April 14th.

5         THE CLERK:  Counsel, please don't forget to state your

6   name.

7         THE COURT:  Yeah, state your name.

8      And if my memory services me correctly, it's like

9   April 15th is when taxes are due or was there some extension to

10  April 18th?  I couldn't quite figure out what day tax day is.

11  It will live in infamy.  What day is tax day?

12        MR. ANGUIZOLA:  Your Honor, this is Roberto Anguizola.

13  And tax day this year was Monday April 18th.

14        THE COURT:  Oh, so it was the IRS, Internal Revenue

15  Service, they gave you a weekend to collect your assets.  Yes.

16        MR. WAXMAN:  I think it was -- this is Seth Waxman

17  speaking.  I think it was the confluence of tax day and Good

18  Friday.

19        THE COURT:  Ah, okay.

20        MR. WAXMAN:  That led --

21        THE COURT:  There you go.  Sorry.  Exactly.  Yeah, I'm

22  sure that's correct.  I'm sure that's correct.  So that's fine.

23  But anyway you know, it was the 18th.

24     You know, the way it hit me was actually in Mr. Waxman's

25  brief was, you got to have an emergency of some weight in order

1    to invoke the injunctive powers of the Court and not

2    basically -- an injunction is not to disrupt a satisfactory

3    status quo.

4          In other words, I can understand that an injunctive relief

5    can be given to stop a particular harm when the particular harm

6    is a serious particular harm that is about to occur.

7          But the way I looked at it -- and you can correct me --

8    the FTC can correct me if I'm wrong -- was that this is a harm

9    that was, quote, known -- a potential harm -- I'm not passing

10   judgment on the merits of whether it is a harm or not -- but it

11   was a -- it was known to the FTC for a considerable period of

12   time, and they didn't seek injunctive relief until shortly

13   before tax day.

14         And after all, I mean, we know what the case is about.

15   The case is about filing for taxes.

16         So it is a particular -- it is a particular remedy geared

17   to a particular time of the year that is of significance here.

18         And so when I got it, I looked at it and thought why wait?

19   What was the -- what was the reason for waiting?

20         Because the problem is if we wait on something like this,

21   first of all, if there is harm, much of it is accrued.

22         And secondly, it becomes in and of itself entirely

23   disruptive to a company that is operating a particular way.

24         Third, it probably minimizes -- has a minimal impact on

25   damages if there are damages because it is -- you wait so late.

**PROCEEDINGS**

1      So, the FTC did respond and their response was -- well,

2   let's see, how should I put it?  How about this:  They were

3   simply out lawyered in this case.  They were out lawyered in

4   that they waited, waited for responses and they weren't

5   forthcoming; and ultimately there were -- they were unable to

6   arrive at a disposition.  And so time elapsed -- time passed

7   and here we are.

8      And it really wasn't their fault because they operated in

9   good faith trying to achieve a result.  They thought they were

10  going to achieve a result or didn't -- I don't know -- and --

11  and time passes, which, of course, happens.  I understand that.

12     And it is not -- it is not the sort of thing where I would

13  say that, you know, somebody is operating in good faith and

14  somebody is operating in bad faith.

15     I don't know that I need to get into that because the fact

16  of the matter is regardless of whose fault it was, here we are.

17  Here we are.

18     And -- and the request for emergency relief is -- it is

19  basically mooted, notwithstanding the merits of the situation.

20     Now, I haven't heard from you.  And I'm quite sure the FTC

21  wants to respond to this, so I will, of course, listen.  But

22  I'm giving you my impression after reading hundreds of pages of

23  argument on this subject.

24     So, go ahead.  Come on up, if you would like.

25         **MR. ANGUIZOLA:**  Good morning again.  Again,

**PROCEEDINGS**

1   Your Honor, Roberto Anguizola, for the record, on behalf of the

2   U.S. FTC.

3          **THE COURT:**  Right.

4          **MR. ANGUIZOLA:**  And here we are.  The reason why it

5   was appropriate for an emergency before tax day -- and I don't

6   want to spend a lot of time on that because here we are after

7   tax day -- can be found in -- before I get into this, I want to

8   address a housekeeping matter, which is that a lot of the

9   material -- I think a lot of the material is under seal here,

10  and I think it is difficult for me to address your very

11  specific questions about the timing and whether this matters

12  without referring to that material.

13         And I don't know whether there is anybody in the courtroom

14  that should not be hearing this information.  So that's a

15  question that I pose to Intuit's Counsel.

16         **THE COURT:**  Well, I don't want a secret hearing.  I

17  mean, this is a public proceeding.

18         **MR. ANGUIZOLA:**  Okay.

19         **THE COURT:**  You know, just -- and really, all I do

20  generally seal is personal identification information, privacy

21  concerns and so forth.

22         In terms of overall strategy and so forth, I'm not so

23  inclined to -- to somehow burden a party with trying to make an

24  argument when, in fact, the argument is based on under seal

25  documents.  I doubt if Intuit has a problem with that.

1          **MR. WAXMAN:**  Your Honor, Seth Waxman for Intuit.

2          **THE COURT:**  Yes.

3          **MR. WAXMAN:**  I don't see -- if we are talking about

4   the issues of exigency, nothing has been filed addressed under

5   seal.  Some confidential business documents have been filed

6   under seal.  And, of course, Your Honor received a sealed

7   filing yesterday.

8          But, on the question of what the exigency is or isn't, I

9   just can't imagine any confidential company information being

10  relevant.

11         **THE COURT:**  Well, okay.  Give your free-wheeling

12  argument and let me hear it.

13         **MR. ANGUIZOLA:**  Okay.  With your permission, I will,

14  Your Honor.

15         So our case was filed March 28th.  And that's important

16  because if you -- if the Court looks at Government Exhibit 298,

17  at Intuit FFA-FTC 105770, it -- it's a chart that maps out

18  Intuit's season and when most -- most consumers purchase

19  products -- tax preparation products from Intuit.

20         And the biggest point -- the peak of the season is the two

21  weeks prior to the tax day.

22         And so, you mentioned earlier that we got out lawyered and

23  maybe we got snookered by the company and its lawyers, but it

24  became clear to us that Intuit wanted to delay this case until

25  after tax day.  That became clear to us --

1          THE COURT:  When did that become clear to you?

2          MR. ANGUIZOLA:  It became clear to us around March.

3          THE COURT:  Well, become clear to me -- if it's true,

4    if they did -- and I'm not commenting on whether they did or

5    not -- it would occur to me much earlier than that, I would

6    think that knowing that April 15th or 18th is tax day, knowing

7    that -- and after all, the FTC does have a calendar.  We know

8    that -- I would think that if I was in defense strategy here

9    having embarked upon a particular marketing plan that was set

10   well in advance of tax day, that maybe they don't want any

11   disruption in their marketing plan because it is geared to the

12   generation of income given that they know that most people,

13   myself included, file around April 15th.

14        That's when we owe the government some money.  Much rather

15   have the money in my pocket than Uncle Sam's pocket.

16        So I --

17          MR. ANGUIZOLA:  Yes, Your Honor --

18          THE COURT:  I mean, really, it seems to me it is sort

19   of a -- somewhat naive, if I may use that word without the

20   pejorative effect, to think that of course they want to run it

21   out.

22        Their strategy, whether legal or not legal or whether

23   appropriate or inappropriate -- and I'm not passing judgment on

24   that -- it is their strategy.  And they want to keep it in

25   effect without a disruption.  And so I think that was obvious

**PROCEEDINGS**

1    pre-March, wasn't it?

2        And by the way, you had conversations with them before

3    that time.  So, I don't know what those conversations were, but

4    my guess is that that they didn't -- they didn't bring about

5    the changes that you thought appropriate in your duty as a

6    member of the FTC staff in a timely manner and that unfolded.

7        But it was somewhat predictable given that there is an

8    inertia of a company to try to change things at a particular

9    time when their income, their revenues, depend upon a plan.

10        **MR. ANGUIZOLA:**  And that's correct.  And that's --

11    obviously our position and hope was that the TRO hearing would

12    happen well in advance of -- with enough advance to prevent the

13    greatest harm, which is the two weeks prior to tax day.

14        I want to address where we are now, which is --

15        **THE COURT:**  Okay.

16        **MR. ANGUIZOLA:**  -- after tax day.

17        **THE COURT:**  Yeah.

18        **MR. ANGUIZOLA:**  If you turn to that same document,

19    Intuit 10577 at Government Exhibit 298, there is still harm to

20    be had.

21        So between now and the automatic extension date for --

22    for -- filing an -- a late tax return, which consumers can do

23    between now and October, Intuit as of tax year 2019 generated

24    $35 million of revenue from consumers in that category.

25        And so even though we can agree to disagree on how naive

1   we were and the timing and whether the Defense Counsel out

2   lawyered us, there is still harm occurring now.

3        And we filed a third declaration of FTC investigator Diana

4   Shiller -- it is Government Exhibit 319 at docket 57-3 -- which

5   demonstrates that the advertising at issue, the deceptive free

6   claims that are at the core of this case, are still being made

7   by Intuit as part of their post-season strategy.

8        So, yes, we -- we wish that we could have prevented the

9   harm that would have happened at the peak, but there is still a

10  lot of harm that can be prevented now.

11       **THE COURT:**  Okay.  So let's move on.  Let's move on to

12  your argument.  Tell me -- let's assume that, you know, bygones

13  be bygones, and there are certain changes -- it is a clean

14  slate.

15       You come in -- let's say you just discovered this.  Who

16  cares.  You come in and you say, you know, Judge, between

17  April 15th and October 15th, if that's the date, you know, this

18  tool, this method, is going to be disseminated to prospective

19  filers; and we feel -- the FTC feels that the representations

20  or the method by which filers are advised as to the mechanics

21  of how the system works is unfair -- is unfair, inappropriate.

22       And it is inappropriate in the following way:  It entices

23  or encourages or represents to a taxpayer that he or she will

24  have paid free service when, in fact, the reality is they will

25  not or the reality is that they will be so deeply involved in

1    the filing system that they will at that point elect to pay

2    compensation to Intuit as distinct from disassociating itself

3    from the website.

4          I think those are the arguments that I sort of got --

5          **MR. ANGUIZOLA:**  And that's correct.  And that

6    behavior, despite the fact that Intuit has knowledge of this

7    action and very well knows that the FTC's concerns with it and

8    should know the illegality of it, the deception that is

9    happening, they -- the very next day after tax day -- if you

10   look at Shiller declaration.  It is on the docket 57-3 at

11   paragraph 14 -- she has an image of a blog published by

12   TurboTax.  "Did you miss the tax deadline?"

13         And then there is a representation "you can start for

14   free."  And when you click that, if you go to paragraph 15, you

15   land on the TurboTax website.  And there is the free claims,

16   "free, zero, zero, zero."

17         The truth of the matter is -- and we have laid this out in

18   our matter -- two-thirds of American consumers are ineligible

19   to file for free using TurboTax.  And that's deception.

20         Intuit's answer is:  Well, we tell them "simple returns

21   only" or something of that ilk.

22         And we have conducted a survey to determine is that a good

23   disclaimer.  And we have consulted with Professor Novemsky from

24   Yale University at GX -- Government Exhibit 302.

25         His survey shows that 55 percent of consumers that have

1  not -- have not used TurboTax in the past -- he refers to that

2  as group A -- 55 percent of those people think that they have a

3  simple tax return even though they would -- based on the

4  questions in the survey they would be ineligible.

5      So the majority of consumers or at least a significant

6  minority, which is the standard, go in and don't understand

7  that disclaimer.  And that disclaimer contradicts the -- the

8  very claim even if it was understood.

9      It is also confusing because we have laid out how -- the

10  disclaimer itself -- Intuit's definition of what "simple tax

11  return" means changes from year to year to year.

12      So I -- shortly after filing this case, I received an

13  e-mail from a consumer saying "Yes, I got snookered this year

14  because last year I had unemployment benefits and last year a

15  simple return under Intuit's definition would include

16  unemployment."  And he was able to file for free.

17      This year, simple return means something else, and it is

18  not included.  So this year he went in; entered all the data;

19  wasted his time and ended -- faced with a decision, "Do I now

20  start all over or do I pay and stop wasting my time?"

21      And the harm that happens is you create -- they are

22  creating a marketplace where the consumers don't -- you know,

23  they think it is a dishonest marketplace, and this is

24  ultimately what we are trying to avoid here.

25      So the conduct is ongoing.  And now they have -- they have

1    had a chance to correct it and they haven't.

2          **THE COURT:**  Well, is your quarrel -- I'm trying to

3    figure out exactly what your quarrel is with.

4          Are you saying they shouldn't say "simple" because

5    "simple" is one of those terms that means -- it is in the eye

6    of the beholder; that something is either simple.  Something to

7    one person may seem simple, to the other person may be

8    complicated.  And therefore, it is not a defining term that

9    would give guidance to a person to understand that he or she

10   would not be required to pay a fee for the services that are

11   rendered.

12         It is just not -- it is not exact enough.  And, in fact,

13   it is misleading in that -- in that it just has too many things

14   in the common parlance of its understanding that would pull

15   people in and that's why it's deceptive.

16         **MR. ANGUIZOLA:**  Well, it begins with the use of the

17   word "free."  Simple return is a --

18         **THE COURT:**  Well, free -- listen, I have no problem

19   with the word "free."  My problem is with the word "simple."

20         I mean, free is free.  Free means no paying.  Do not pay

21   and don't have to pay.  That's what free means.  It doesn't

22   mean anything else.  It doesn't mean sort of free.  Pay a

23   dollar, $10, $20.  Free is free.

24         But that's not -- is that the deception?  Are you saying

25   it is really not free?  It is not free in the sense that they

1    charge?  And, therefore, it is not free.

2            MR. ANGUIZOLA:  It is not free --

3            THE COURT:  But they come back and they say:  Look, we

4    didn't say our system is free to everybody.  We said it's free

5    if the return is a simple return.  That's what we said.

6        Now, so the deception, I think, at one level has to be

7    with the term "simple" and not "free," I think.

8        Have I got it wrong?  Tell me I got it wrong.

9            MR. ANGUIZOLA:  I don't think --

10           THE COURT:  What?

11           MR. ANGUIZOLA:  I don't think you have it exactly,

12   right.  The deception --

13           THE COURT:  Okay.

14           MR. ANGUIZOLA:  -- begins with the word "free," and

15   then there are different variations of their ad.

16       So the question is:  Is there some language that modifies

17   the claim free and -- in other words, a disclaimer?  And is

18   that disclaimer clear and conspicuous?

19       So the Novemsky survey went to the question of whether the

20   disclaimer "simple return" is clear.  It is not clear.  People

21   don't understand what that means, and it is a -- and it is a

22   moving goalpost because Intuit changes it all the time.

23           THE COURT:  I understand that argument.

24           MR. ANGUIZOLA:  It is also not --

25           THE COURT:  Why am I wrong in saying the confusion

1    arises out of the term "simple?"  It doesn't arise out of the

2    term "free."

3        Free gets you there.  Free gets you in the door.  But

4    there is a disclaimer.  They don't say it is free to everybody,

5    and nobody thinks it is free to everybody.

6        MR. ANGUIZOLA:  The survey data shows otherwise,

7    Your Honor, but you are not completely wrong for all of the

8    ads.

9        THE COURT:  Well, okay.  That is virtue.

10       MR. ANGUIZOLA:  But what -- part of the issue deals

11   with conspicuousness.  So if we turn back to the television ads

12   that they have now pulled -- conveniently pulled at the end of

13   the season when they knew that they were going to get sued --

14   and you can call that shrewd and good lawyering -- but that's

15   what they did.

16       In those ads simple return is a blurry microprint at the

17   end of the ad at the bottom.  Sometimes they have a voiceover.

18   They say 30, 40 times or however many times.  And so in that

19   instance it is not conspicuous.

20       They get closer -- even if they were able to argue that in

21   some of the space constrained ads or in some of the internet

22   ads, that they get closer to simple returns -- return -- the

23   simple return disclaimer being conspicuous, it is not clear.

24   And that's where the Novemsky survey illustrates that it is not

25   a good disclaimer because people don't understand what they

1   mean.

2        So there are two problems.  One, in a lot of the ads, the

3   ads that started the case, it is not conspicuous at all.

4        So the consumer will just take in the promise that it is

5   going to be free without ever seeing the disclaimer.

6        And then the second problem is even when consumers can see

7   and comprehend that there is a disclaimer, they don't

8   understand what that means.  And it contradicts the central

9   claim, which is that is free.

10        So there is -- there are those two distinctions, and there

11   is -- it is a moving target.  There's different kinds of ads,

12   but even the current ads that they are running have a problem

13   because that disclaimer is just not clear.  It is not

14   understood.

15        **THE COURT:**  All right.  Well, let me hear from

16   Mr. Waxman, unless you just want to submit it?

17        **MR. WAXMAN:**  Your Honor, Seth Waxman for Intuit.  I

18   mean, I -- no, I don't want to, of course, just submit it.

19        I do want to address the merits and particularly this

20   issue of the confusion involving "simple" on a going forward

21   basis, but I think I need to say a few things in response to

22   misrepresentations that were made before.

23        This notion that we have tried to snooker the FTC is so

24   utterly false, and the paper trail -- there is an exhaustive

25   paper trail that will demonstrate some of which is already in

**PROCEEDINGS**

1    the record.

2        This investigation was begun in a very public way three

3    tax seasons ago.  Every single time there was a request for

4    production of documents, witnesses, et cetera, we have provided

5    them with alacrity.

6        We have attempted to, over the course of those years, make

7    changes -- the screen that you were just shown is from the 2019

8    tax year.  We have made any number of changes to the ads that

9    they claim were deceptive in an effort to satisfy them.

10       We have asked them -- in fact, literally, quote, begged

11   the FTC since they filed its -- sent its draft complaint to us

12   almost a year ago to explain to us what it is -- on what basis

13   they believe these ads are deceptive.

14       These are ads that say very prominently -- you can see in

15   the screen you just saw on the very first line -- "for simple

16   returns only" which is hyperlinked.  When you click on that

17   hyperlink, it tells you exactly who qualifies and who doesn't.

18       It then says -- right after "for simple returns only",

19   quote, "see if you qualify at turbotax .com."

20       And when you go to turbotax .com, you get a screen, which

21   was also displayed by Mr. Evans, that has the tile of things

22   saying:  "Tell us about you."  Do you --

23           **THE COURT:**  Why don't you walk me through this?  Walk

24   me through this in terms of a current -- I mean, current as of

25   today, a year or so --

PROCEEDINGS

1        **MR. WAXMAN:**  Yeah.

2        **THE COURT:**  Here is -- let's -- let's talk about what
3    we are going to talk about.  I'm not concerned about the past,
4    though I think it is entirely appropriate for you to respond.
5    For the record and so forth --

6        **MR. WAXMAN:**  I understand.  There is one more thing I
7    do want to say.

8        **THE COURT:**  Go ahead because I don't want to cut you
9    off.

10       **MR. WAXMAN:**  We have asked them over and over and over
11   again in the past year to tell us what is still objectionable
12   about the changed ads, none of which are running.

13       They have told us repeatedly:  "We are not going to get
14   into that with you."

15       We went to them in November and said, look, let's get an
16   agreement on some -- what it is that you want so we can do this
17   before tax season.

18       We are a consumer product company.  We don't want to be on
19   the wrong side of the government.  We rely on repeat business.

20       If there is something that is confusing to a significant
21   part of the population, we want to conclude it; and we were
22   told repeatedly "We are not willing to discuss that."

23       "We are not willing to discuss that."

24       The very first time we heard anything was about two weeks
25   before the hearing before the complaint was filed when we met

1  first with the Career Chief and then with the Chair of the

2  Commission who told us what it is that she still found

3  objectionable.

4      And that very day we wrote to her and said:  Look, we will

5  pull all of the television, video, Facebook, online ads; okay.

6  And in response to that a few days later we got this lawsuit.

7      Now, this lawsuit is a request not that Your Honor decide

8  the merits of whether what we are doing on a going forward

9  basis is -- does or doesn't violate the FTC Act.

10     They have noticed this under Section 5 for a hearing in

11  September.  The FTC is going to decide that issue.

12     They filed a complaint with you seeking only the following

13  relief:  A temporary restraining order and a preliminary

14  injunction pending the September hearing to prevent us from

15  running the ads which had already stopped.

16     They now have, not in any pleading, a new exigency, which

17  as it turns out that some people missed the filing deadline and

18  they have to file by October.

19     And so their request here today is that you enter a 14-day

20  temporary restraining order and then have some hearing on a

21  preliminary injunction based on a showing that utterly does not

22  exist.

23     I mean, as Your Honor stated at the outset, preliminary

24  injunctive relief is -- as the Supreme Court has explained, is

25  extraordinary and a drastic remedy.  And what is extraordinary

1    about this case is how completely insubstantial the

2    Government's papers are.

3         They have attached -- we have some testimony today from my

4    colleague about somebody who supposedly called him to say he

5    was snookered.  We have a complaint, a temporary restraining

6    order, and a reply brief that doesn't attach or reference a

7    single consumer declaration.

8         They have represented that of the tens of millions of

9    people who use TurboTax, both the free edition and the various

10   paid editions, they have received 23 complaints about the

11   advertisements.

12        We don't have those complaints.  We don't know whether a

13   single one of those complaints has to do with some

14   misconception about whether you could or couldn't file for

15   free.

16        The only thing they have produced -- although we have

17   declarations and declarations and declarations saying that they

18   had to spend years talking with experts and consultants about

19   surveys -- what we have is some gossamer survey that was done

20   the week before -- start to finish the week before they filed

21   their complaint that purports to test whether people who see

22   the ads, which are not running anymore, believe that everyone

23   can file for free.

24        And yet, the survey did not show any one of the challenged

25   ads to anybody.  It just asked people:  If you were told that

1  it's free if you file a simple return, do you think your return

2  is simple?

3      And so that survey says nothing whatsoever about the

4  challenge in this case, which is that our ads were deceptive.

5      It doesn't say anything about the ads at all because not

6  one person was shown any of these ads.  And that is the sum and

7  substance of the Government's representations here.

8      And it requires not only a denial of the TRO and the

9  preliminary injunction but dismissal because that is the only

10 relief that is requested.

11     Now, the Government --

12     **THE COURT:**  Are you then -- let me try to posit a bit.

13 Are you saying that those ads that have been pulled, if that's

14 the right word, discontinued, in light of FTC concerns and

15 discussion and so forth, is that as to that category of ads,

16 they will not be disseminated, published, going forward?

17     So there really isn't the -- the prospect of a, quote,

18 continued -- merits aside -- a continuing harm?

19     So this -- you are saying this motion has to fail for a

20 variety of reasons but one of which is there isn't an ad out

21 there that we are publishing that is the subject of a complaint

22 by the FTC.

23     We don't even know exactly what they are talking about.

24 They haven't viewed -- criticized or put into the record a

25 present ad that would be susceptible of that interpretation.

**PROCEEDINGS**

1    And secondly, there is no consumer evidence, if I can use

2   that term, to show that there is a deception or a confusion as

3   it relates to that particular ad.  Is that a fair summary?

4        **MR. WAXMAN:**  Yes.  Yes, it is even better than that

5   because although they have no evidence whatsoever that the --

6   that the television, video and online ads -- that we have

7   represented will not ever run again.  We aren't even

8   planning -- we have undertaken not to run any television or

9   video or online ads until next tax season, which would be after

10  the FTC conducts its Section 5 hearing and makes a ruling.

11       **THE COURT:**  So then what is the -- what is your

12  response to the -- to the question:  Between now and

13  October 15th, how then is Intuit or TurboTax, whatever you want

14  to call yourselves, how are you presenting the product to the

15  public effective on April 18th to December -- to October?  How

16  is it being shown to the public?

17       **MR. ANGUIZOLA:**  Right.  So it is shown to the public

18  on our website.  And Your Honor can -- we have invited

19  Your Honor on paper and now orally to go to www.turbotax.com,

20  which is what the previous ad said you should do to see if you

21  qualify, and you can see for yourself that it makes lavishly,

22  promiscuously clear that it has four different editions.

23    There is a free edition, which 14 million people use each

24  year, totally for free; and that the free edition is for simple

25  returns only, which is a hyperlinked statement.  And when you

1    go to the hyperlink, it will give you the list of eligibility

2    for filing for free.

3        And it then says:  To see if you qualify, go to

4    turbotax.com.  And when you go to turbotax .com, you will

5    see -- Mr. Evans put it up on the page -- a display of tiles

6    that says tell me about -- tell us about yourself to decide

7    which edition you should use.

8        And if you click on, for example, "I sold stocks.  I have

9    a rental property.  I have childcare expenses.  I -- I have

10   donated more than $300 in charitable contributions," it

11   automatically tells you that you cannot use the free edition.

12   You have to use either basic or one of the other higher-grade

13   things.

14       And so, leaving aside the complete absence of proof -- the

15   complaint in this case addressed three or four TV ads.

16       The very first time that we were told in a meeting with

17   Chair Lina Khan what it was that the Commission still thought

18   was misleading, that very day we undertook to pull the ads, and

19   the ads have been pulled since then.

20       They are now saying:  Well, we ran into court asking for a

21   TRO and a PI because tax day was coming.  They now say:  Well,

22   some people, some very small percentage of people, missed the

23   deadline and they are on extension.

24       And it's true that none of the ads that are in our

25   complaint are running anymore, but you can still -- and you can

1    look at the latest declaration from their paralegal -- if you

2    Google "online free tax" --

3        **THE COURT:**  Isn't my answer to it:  Okay, I'm going to

4    allow you to amend your complaint.  Go amend your complaint and

5    gear it towards -- I'm not granting the TRO.  I'm not granting

6    the preliminary injunction.  Times have changed.

7        We are now talking about those people who are going to

8    take advantage of the April 18th to October 15th extension.

9        If -- if you feel that there are deceptive ads out there

10   now, put them in your amended complaint and then we will talk

11   about it.  They will either be there or they won't.

12       I mean, I don't, like, to know really what to do in the

13   sense that I'm not going to do what they want to do basically

14   because I think it is moot.  And I'm not passing any judgment

15   on the merits.  But it is moot.

16       I mean, I don't think it is appropriate for a Court to

17   say:  Well, it is moot.  But let me tell you how I really feel.

18   I like to do that but --

19                          (Laughter)

20       **THE COURT:**  -- I'm not supposed to.  I'm not supposed

21   to do that, so I'm not going to do that.

22       But I think that because they are talking about, one, a

23   serious matter.  I don't treat this as not a serious matter.

24   Two, that people should have an opportunity to come to court,

25   the Government included if, in fact, they feel that they have a

**PROCEEDINGS**

1  basis for it.  So I ask you, Mr. Waxman, what is wrong with

2  that?

3         **MR. WAXMAN:**  I think if Your Honor were to dismiss the

4  complaint and deny the relief and give them the opportunity,

5  which they have in any event to file a new complaint; and they

6  can file a complaint with a TRO that not only says that these,

7  you know, Google and Bing hits are misleading but actually

8  adduce a modicum of evidence that would allow Your Honor to --

9         **THE COURT:**  They have to.

10         **MR. WAXMAN:**  Yeah.

11         **THE COURT:**  I mean, whether --

12         **MR. WAXMAN:**  So --

13         **THE COURT:**  It is not Sunday school.  You know, I

14  mean, they have to follow the rules.  So let me ask -- this is

15  fabulous to have in-live, person-to-person argument in the

16  courtroom -- but I want to ask the FTC.

17     So, what is wrong with that?  In other words, I simply

18  dismiss -- I deny your request for injunctive relief.  I

19  dismiss with leave to amend.  I think I dismiss with leave to

20  amend.  I don't think I simply -- I don't know how else you get

21  to a leave to amend unless it is dismissed.  Give me your

22  views.  Come on up.  We will chance it.

23         **MR. ANGUIZOLA:**  This is Roberto Anguizola.  They are

24  mischaracterizing the complaint.  So --

25         **THE COURT:**  Okay.

1          **MR. ANGUIZOLA:**  The complaint -- they would like the

2     Court to believe that the complaint was only about television

3     ads.  And it is correct.  We highlighted the television ads

4     because at the time that the complaint was filed the television

5     ads were ongoing, and the television ads were particularly

6     egregious.

7          But from the very get-go, if you look at paragraph 30 of

8     the complaint -- I believe it is docket 1 -- it says:  Intuit

9     has employed ads including via television, YouTube and other

10    social media marketing the premium version of TurboTax

11    including but not limited to those in the absolute zero and

12    free, free, free campaigns.  They have pulled the free, free,

13    free campaigns.

14         We were looking at ads beyond television.  It's in black

15    and white in paragraph 30.  We were looking at ads beyond those

16    particular television campaigns.

17         Then if we turn to paragraph 126, reads:  The FTC has

18    reasons to believe that Defendant is violating or is about to

19    violate laws enforced by the Commission.

20         And 126(c) says:  Intuit has continued engaging in many of

21    the challenged acts and practices even after learning it was

22    the subject of Government investigations; and (d), during the

23    pendency of the FTC's investigation, Intuit has continued its

24    deceptive free advertising which is ongoing.

25         Then, Count One -- again, none of -- that all envisions a

1  situation where there is harm at the time a complaint is filed

2  and there is harm beyond television and there is harm that --

3  there is a belief that it is going to keep going on.

4      Then Count One is not limited to television.  I'm not

5  going to read it, but it -- it deals with -- it is broader than

6  television.

7      It deals with instances in connection with advertising,

8  marketing, promotion, offering for sale or sale of online tax

9  preparation products or services including through the means

10  described in paragraphs 16 through 126.

11      That is beyond television.  The paragraphs 16 through 126

12  deal with the website.  They deal with social media.  They do

13  deal with television.

14      So what they did was take out a subsegment of it, and now

15  they would like the Court to believe that our complaint doesn't

16  cover the ongoing conduct.

17      $35 million of revenue between now and October maybe is a

18  drop in the bucket for Intuit, but in my career at the FTC,

19  most of my cases involve harm that is far less than that.  And

20  it still merits --

21          THE COURT:  Your argument is your complaint is

22  adequate in that regard and that there is no necessity of

23  amending your complaint because it stands for and accuses

24  Intuit of engaging in deceptive practices, which are ongoing.

25          MR. ANGUIZOLA:  Correct.

PROCEEDINGS

1    **THE COURT:**  And there is a real harm because of the

2   existence of post-April filers.

3    I don't think that they missed the deadline.  I have

4   been -- my tax accountant says:  No, you are not missing a

5   deadline.  You are taking advantage of a different date.

6    So it is not that.  It is another way -- assuming one

7   qualifies, it is another way of collecting revenue under the

8   law.  So you are saying that is ongoing -- your complaint is

9   adequate.

10    **MR. ANGUIZOLA:**  That's correct.

11    **THE COURT:**  What about Mr. Waxman's point, you know,

12   you don't have anyone complaining here basically?  What are you

13   talking about?  You know, is this just a theory that people

14   don't understand it because if they didn't understand it, you

15   know, why -- how many clients do you have in roughly in the

16   last year?  How many people?

17    **MR. ANGUIZOLA:**  So in the last tax season 14 million

18   people filed for free.

19    **THE COURT:**  No.  But the whole thing.

20    **MR. ANGUIZOLA:**  The whole thing is -- free is the

21   biggest category.

22    **THE COURT:**  Yeah.

23    **MR. ANGUIZOLA:**  But I don't know, maybe 40, 50 million

24   people use it.

25    **THE COURT:**  Out of there -- out of there, there would

**PROCEEDINGS**

1    be a substantial number of people who have -- if it is true --

2    have a level of dissatisfaction with the way the product is

3    being presented to them.

4         And Mr. Waxman's point, as I understand it, is it's not

5    there and that's a pretty good indication, isn't it, that it is

6    not -- that it is not deceptive?

7         People come in, after all, and they look at cans of food

8    on Safeway counters which say "all natural," and they say wait,

9    a minute the propellant that takes out -- that's not all

10   natural.  I mean, they say:  What are you supposed to assume,

11   that, like, Old Faithful is propelling the material out?

12        And I get those.  I get:  Is all butter all butter?  Is

13   all natural all natural?  What does that mean?  I never quite

14   got it.

15        But I think the saying is that people aren't shy about

16   grievances that they have if they feel they have been deceived

17   and especially within the context of where they are paying

18   money and required by law to pay money.

19        So if they think that they have been hoodwinked, where are

20   those declarations?

21        **MR. ANGUIZOLA:**  A couple things on that.  He has

22   misstated the evidence.  So we decided to proceed more

23   efficiently here and conduct a survey rather than rely on

24   consumer declarations.

25        And according to the survey, 52.7 percent of people in

**PROCEEDINGS**

1  group A, they mistakenly think that they can file for --

2  TurboTax for free.

3       So those -- there is a significant minority -- I would say

4  majority -- but the standard is significant minority that are

5  under the misimpression they can file for free even though the

6  people that were surveyed would not have been eligible for

7  that.

8       And when they are asked what was the source of that

9  belief, 46 percent stated they received that belief based on

10  TurboTax advertisements; and 46.9 received that misimpression

11  from the TurboTax website.  And if we combine the source of

12  the -- the ads and the website causing the confusion, it goes

13  up to 72.3 percent.

14       And these are people that are ineligible and they are

15  saying:  Why am I confused?  Because I either saw an ad or I

16  went to the website.

17       And Professor Novemsky explains why he didn't do a

18  traditional copy-test in this case.  And the reason for that

19  is:  First, he thought it was appropriate to do a perception

20  survey because the ads have been running for so long and

21  have -- and the deception has been so pervasive that he wanted

22  to know am I dealing with a pool of people where a traditional

23  copy-test which is designed to just test particular claims in a

24  particular ad -- is the pool of people so confused, through no

25  fault of their own and they are identifying Intuit, TurboTax,

1    as the source of that confusion -- is that group so confused

2    that we can't do a traditional copy-test?

3         And that's why they didn't do that and they went with this

4    perception survey, which is powerful in and of itself.

5         Defendants didn't copy-test or if they did copy-test, they

6    didn't provide it to the FTC and haven't provided it to the

7    Court.

8         And the reason for that, I suspect, that they probably did

9    a perception survey -- they have no -- they can do that through

10   a consulting expert -- and decided that a copy-test was not

11   appropriate.  So you don't have copy tests from either side.

12        And to go -- in terms of the consumer complaints, we have

13   the declaration of Diana Shiller, which is at docket 12-655,

14   where she summarizes the consumer complaints; and there is many

15   more than what they -- what they describe.

16        As of March 28, 2022, the FTC had received 571 consumer

17   complaints about free TurboTax.

18        From January 1, 2021 to March 28, 2022, the FTC received

19   152 complaints.

20        She summarizes the 57 complaints that have been filed from

21   November 1, 2021 to March 28, 2022; 55 of the 57 consumers

22   thought that they could file for free; 23 of the 57 consumers

23   mentioned they saw advertising indicating that their tax filing

24   would be free; and 54 to 57 consumers paid TurboTax when they

25   thought their filing -- even though they initially went there

**PROCEEDINGS**

1  because they thought the filing was going to be for free.

2      Traditionally the consumer complaints that we receive are

3  the tip of the iceberg.

4      I have done cases with zero consumer complaints.  You

5  don't need consumer complaints, but there is a lot of them and

6  we did a survey instead.

7      The ads covered by the current complaint are ongoing as of

8  a couple days ago and --

9          **THE COURT:**  Can you run me through one of these ads --

10          **MR. ANGUIZOLA:**  Sure.

11          **THE COURT:**  -- on my computer here or whatever it is

12  called?

13          **MR. ANGUIZOLA:**  Sure.

14          **THE COURT:**  It is nice to talk about it.

15          **MR. ANGUIZOLA:**  Yeah.

16          **THE COURT:**  It is also nice to see it, so --

17          **MR. ANGUIZOLA:**  You just go to --

18          **THE COURT:**  Here we go, www.turbotax .com.

19          **MR. ANGUIZOLA:**  And one thing that is missing is this

20  is a deceptive door opener case.  And so what that means is

21  there are ads disseminated all over the internet, all over

22  social media.  They have stopped television.  But up until the

23  eve of the filing of this case television and even after that,

24  they could not --

25          **THE COURT:**  Well, I watched the Super Bowl.  I think

**PROCEEDINGS**

1  there were some ads in there.

2       **MR. ANGUIZOLA:**  And they had ads -- they had an ad

3  that violated -- that covered --

4       **THE COURT:**  I have no comment on --

5       **MR. ANGUIZOLA:**  -- during the Academy Awards.

6       **THE COURT:**  -- what happened with the Super Bowl.

7       The 49ers should have been in that.  I mean, that was the

8  violation in the Super Bowl.

9       **MR. ANGUIZOLA:**  So if you turn to paragraph 6 of the

10  Shiller declaration, docket 57-3, there is an example of a

11  Google ad.  File an extension for free.  Free tax filing.

12       **THE COURT:**  Okay.

13       **MR. ANGUIZOLA:**  So that's on the screen.  That's one

14  example.  That's ongoing.  That one is April 19th.  That's the

15  same day that she filed her declaration.

16       **MR. WAXMAN:**  I'm sorry.  What paragraph is that?

17       **MR. ANGUIZOLA:**  Paragraph 6, docket 57-3.

18       If we turn to paragraph 8, there is a TurboTax banner ad

19  in the Milwaukee Journal Sentinel.  That was as of April 14th.

20  That one is before the deadline.

21       If we go to paragraph 10 and then scroll down, scroll down

22  further, there is an example of a Facebook ad.  Then

23  paragraph --

24       **MR. WAXMAN:**  Excuse me.  That is not an ad that is

25  running and you know it.

PROCEEDINGS

```
 1            MR. ANGUIZOLA:  That is an ad from the Facebook --

 2            MR. WAXMAN:  -- library.

 3            MR. ANGUIZOLA:  Right.

 4            THE COURT:  I'm sorry.  What is the distinction?

 5   I'm --

 6            MR. WAXMAN:  It is an ad from the past that has been

 7   documented.

 8            THE COURT:  Oh, okay.  No, no, I get it.

 9            MR. WAXMAN:  -- in a library of prior publications.

10            MR. ANGUIZOLA:  I think Facebook pulled the ads from

11   the past.  It has the recent ones.  But even if they are not on

12   Facebook, they are on Google.  They are on Apple News.

13            THE COURT:  Well, what I'm asking you for is this, if

14   you can show me an ad that was running as of April 18th or

15   19th; and I can look at it and I can understand what you are

16   complaining about.  That's all I need to see.

17            MR. ANGUIZOLA:  So paragraph 9 is an April 18th --

18            THE COURT:  Now, looking at this one -- looking at

19   this one as an example it says -- so maybe I am taking the air

20   out of Mr. Waxman's presentation -- but it says "TurboTax free

21   edition, for simple tax returns only*"

22       That's what it is.  Okay, and it's your position that

23   that's not explanatory enough that that's -- that's an

24   inadequate disclosure.

25            MR. ANGUIZOLA:  That's correct.
```

1       **THE COURT:**  That's an inadequate disclosure.  If I'm

2   there, I see this ad and I say:  Oh, boy, free, great.  So then

3   I see TurboTax free edition.  That is fabulous.  For simple tax

4   returns only.  Oh, I say:  What does that mean?  I don't

5   understand what that means.

6       What then do I do as a consumer?  What is my

7   responsibility as a consumer to do anything with respect to

8   this ad, which tells me that it is limited to simple tax

9   returns?

10      **MR. ANGUIZOLA:**  The problem is that the consumers --

11  the survey results don't show that the consumers don't know

12  that what means.  They think they know what it means, and they

13  think their returns are simple even when they are not simple by

14  Intuit's definition.

15      And so if you -- they are making a zero or free claim --

16  if you scroll down, James, I think one of the things that is

17  missing and that is more prominent on the screen if you look at

18  the language underneath the file date to file, it says free

19  in -- that's more prominent.

20      It is zero, zero, zero, which is the same as free; and the

21  only disclaimer is "for simple tax returns only" and consumers

22  believe that their returns are simple even when they are not.

23      **THE COURT:**  So your statement is the disclaimer is

24  meaningless?

25      **MR. ANGUIZOLA:**  Exactly.

1    **THE COURT:**  So you can put anything in that

2    disclaimer, like "just kidding" or "it only works if you are a

3    lifelong Libertarian."  Whatever it says you think the

4    disclaimer is irrelevant to the infraction; that is, the wrong

5    that has been committed.

6    So your suggestion to me -- I can stop -- Judge, just

7    stop.  Once they say "free, free, free," they are on the hook.

8    Doesn't make any difference what we say underneath.

9    **MR. ANGUIZOLA:**  There may be instances that --

10   **THE COURT:**  When you say "simple tax return," which I

11   always thought the problem is that people don't understand what

12   "simple" means.  Simple to one person isn't simple to another.

13   That is the deception; that people will think that

14   "simple" means something which it doesn't mean which it -- like

15   somebody says:  Oh, well, I have a -- I have some interest.  I

16   have a government loan or I have got unemployment benefits or

17   dat, dat, dat.  Nothing is simpler than that.

18   And they say:  Oh, no, no, no, we think that is simple but

19   it is not actually simple.

20   So the term "simple" doesn't -- doesn't appropriately

21   elucidate, appropriately encompass the disclaimer that ought to

22   be considered by the consumer when the consumer gets on this

23   website.  That's the FTC's --

24   **MR. ANGUIZOLA:**  That's absolutely correct.

25   **THE COURT:**  Well, then I think I can try to figure it

1   out from that point.

2      MR. ANGUIZOLA:  And we lay out the FTC black letter

3   law on disclaimers, when they are appropriate.

4      If the disclaimer -- first of all, Intuit came into it

5   backward.  They looked at the .com disclosure guide and found

6   instances where the FTC says "for certain disclaimers you can

7   use a hyperlink."

8      What they didn't -- what they omitted, and they omitted to

9   file this with the Court, were the first ten pages of the guide

10  that talk about instances where the disclaimer -- the

11  information that is being disclaimed is so central to the claim

12  such as where you have cost information that you can't --

13     THE COURT:  So the disclaimer you would actually

14  entertain, it would be a disclaimer in this ad which would say

15  "TurboTax free edition but probably not for you."

16     MR. ANGUIZOLA:  That would be one -- there is -- and

17  our order doesn't --

18     THE COURT:  I mean, that would certainly be fair.

19     MR. ANGUIZOLA:  Our proposed order is not

20  prescriptive.  They can certainly come up with a different way

21  to do it, but this is from the part of the guides on . com

22  disclosures that they omitted.

23     Disclosures that are an integral part of a claim or

24  inseparable from it should not be communicated through a

25  hyperlink.  Instead, they should be placed on the same page and

**PROCEEDINGS**

1  immediately next to the claim and be sufficiently prominent so

2  that the claim and the disclosure are read at the same time.

3       **THE COURT:**  Why isn't that this?  I mean, it is right

4  there; isn't it?  I mean, it is right under the word "free,

5  free, free" or "zero, zero, zero," it says "TurboTax free

6  edition, for simple tax returns only."

7       **MR. ANGUIZOLA:**  We go back to simple tax --

8       **THE COURT:**  I understand that.  They are saying the

9  disclosure is inadequate.

10      **MR. ANGUIZOLA:**  That's correct.

11      **THE COURT:**  It should say "but not for you."  Okay.  I

12  got it.  I understand.  It seems like we are rewriting the

13  issues of disclosure.

14      **MR. ANGUIZOLA:**  Your Honor, if I may, Your Honor,

15  first of all --

16      **THE COURT:**  I will return to you.

17      **MR. ANGUIZOLA:**  I had one more --

18      **THE COURT:**  Well, then go right ahead and then I will

19  give it to Mr. Waxman.  We have plenty of time.

20      **MR. ANGUIZOLA:**  At paragraph 15, this is the latest

21  ad, and that one is squarely dealing with the people that

22  missed tax day.

23      And Your Honor more correctly described it as you get an

24  automatic extension, so it is not that you are in violation but

25  there is that group of people.  And this conduct from now until

**PROCEEDINGS**

1   October is going to generate $35 million of revenue.

2       And this is a problem.  When they click on "start for

3   free," then you can turn to paragraph 15, and you get right

4   back to a free claim and an inadequate disclaimer that doesn't

5   do its job.

6       **THE COURT:**  The disclaimer in the one you just showed

7   me is a hyperlink which says "simple tax refund only."

8       **MR. ANGUIZOLA:**  Right.  And hyperlinking is not

9   recommended for essential claims involving costs.

10       **THE COURT:**  No.  The irony is in this case, of course,

11   I have already ruled that the hyperlink for the arbitration

12   clause was inadequate.

13       And the Circuit in its wisdom reversed me.  And then, of

14   course, Intuit came in and said:  Oh, by the way, we don't want

15   arbitration.  But that's not this case.

16       **MR. WAXMAN:**  You wouldn't know it isn't this case

17   since 60 paragraphs of this complaint are complaining about the

18   IRS free file program, which the FTC well knows both Intuit and

19   H&R Block withdrew from following the 2019 tax year.  But

20   nonetheless, we are subjected to pages and pages of allegations

21   about it.

22       But let's look at the examples that he just gave.  And,

23   Your Honor, I think net-net the best thing to do is for you to

24   just follow those links.

25       Let's look at them in reverse order.  The one that he

**PROCEEDINGS**

1  identified on paragraph 15, it has:  Did you miss the deadline?

2  And it says, you know -- the very next page.

3      **THE COURT:**  Put it up on the board here so I can see

4  it, please.  Thank you.  Okay.

5      **MR. WAXMAN:**  I don't think I can stay at the mic

6  and -- so here is one that -- this is actually one that is

7  still running.  It is on a blog.  It is not a video ad or

8  anything.

9      It says:  Did you miss the deadline?  And then right

10 underneath it -- if you just scroll up the page, Mr. Evans --

11 it says:  I clicked on -- no, down, I'm sorry -- I clicked on

12 the affiant, the start for free button and it directed me to

13 the page following, which is on the next page.

14     And this I think is important because this is exactly what

15 happens.  It says:  Let's find the right tax solution for you.

16     And if you click on "I donated $300 or more," you will see

17 that it tells you right off the bat you can't use for free.

18     If you click on "I own a home" or "I have rental income"

19 or "I sold stocks" or "I am self-employed," it tells you just

20 by clicking on the information -- the tabs that they are asking

21 for -- which product is available or not available.

22     If we go back to the ad that my friend was referencing, I

23 think it was paragraph -- I think it was paragraph 9, yes, 9

24 where Your Honor pointed out that in the ad -- or this is an

25 e-mail -- it says TurboTax free edition for simple tax returns

1   only, asterisk.

2       Now, my friend and the affiant didn't bother to display

3   for Your Honor the rest of the page which has the asterisk.

4   And the asterisk says -- I guess I have lost this already on my

5   telephone -- the asterisk says --

6           **THE COURT:**  Well, can you do it?

7           **MR. WAXMAN:**  Yeah.  "Simple" --

8           **THE COURT:**  Give it to somebody under --

9           **MR. WAXMAN:**  Not under 70.

10          **THE COURT:**  Okay.

11                      (Laughter)

12          **MR. WAXMAN:**  The asterisk at the bottom of the page

13  says "a simple tax return is form 1040 only."

14      "Situations covered in TurboTax free edition, TurboTax

15  live basic and TurboTax live full service basic are the

16  following:  W2 income, limited interest and dividend income

17  reported on a 1099 INT, claiming the standard deduction, earned

18  income credit, child tax credits, and student loan interest

19  deduction."

20      Those are the instances, the asterisk, that explains to

21  you what a simple tax return is.

22      Now, on this notion that -- it is difficult to unscramble

23  all this.  Professor Novemsky's one-week survey which showed

24  nobody any of these ads, either the ones that are now in

25  response to a Google search request or the TV video ads,

**PROCEEDINGS**

1   purports to answer the question whether people are confused

2   when they see the ads about whether they can or can't file for

3   free.

4       And what Professor Novemsky basically said is:  I'm not

5   going to show anybody the ads.  I'm just going to collect a

6   bunch of people who say they have never used the TurboTax

7   product and just ask them the question:  Do you think you file

8   a simple tax return; so just like you and I were sitting in a

9   cafe on Market Street and just asked everybody who walked by.

10      The question is whether these ads are deceptive.  The word

11  that Your Honor pointed to -- the only thing that could be

12  deceptive is some understanding about what "simple" means.

13      Now, "simple" is how the California Franchise Tax Board

14  describes its free filing surveys for simple returns only.  And

15  we have that in the record in this case.

16      It is also exactly the same terminology that Intuit's

17  commercial competitors -- H&R Block, TaxSlayer and TaxEdge --

18  all use the term "for simple returns only."

19      And in the outset of this investigation three years ago,

20  we changed it to say "simple returns only."  We hyperlinked it.

21      If you go to any of these websites and you follow the

22  Google hit and you click on the TurboTax file for free thing,

23  you will see pop up what I just read you.  This is available

24  only for the following types of categories.

25      We added the words "visit turbotax .com to see if you

 1  qualify;" and if you click on that hyperlink, it gives you this

 2  menu of things where you can say -- you know, if you click "I

 3  own a home" or if you click "I made more than $300 in

 4  charitable contributions" or "I sold stocks" or "I had rental

 5  income," you don't qualify.

 6       I mean, this isn't a case in which they are entitled to

 7  extraordinary preliminary injunctive relief pending a hearing

 8  that they themselves have set in which they just say "this is

 9  confusing."

10       You need -- in order to have a drastic or extraordinary

11  remedy of preliminary injunctive relief pending their merits

12  hearing, you not only need evidence.  They need to carry their

13  burden that the evidence shows that they are likely to succeed

14  on the merits.  And they have nothing.

15       I just want to correct two things.  My friend said:  Oh,

16  well, there were 571 complaints.  That is a typo and they well

17  know that.  It was 57 total of which 23 related to the ads.

18  But we don't know what people -- why they were complaining

19  about the ads; 571 is just the typo.  Otherwise, the numbers

20  don't add up.

21       Second of all, they say:  Well, you know, Professor

22  Novemsky didn't really think that he could properly do a

23  copy-test by which they mean how people the ads that they are

24  claiming are irretrievably deceptive to a reasonable person.

25  And they say we didn't do that either.  I don't know what they

1    are talking about.

2          We provided them long before they filed the lawsuit a

3    survey and report done by a woman named -- I forget her first

4    name but her last name is Kirk Fair, who the FTC routinely uses

5    as its own expert in these cases, who did a copy-test result

6    (sic) and reported that people were not confused.  The level of

7    confusion was minuscule.

8          And this notion that oh, well, we couldn't do it because

9    so many people have some preconception about what a simple tax

10   return is -- I mean, it is just ridiculous.

11         **THE COURT:**  Thank you.  Anything further?

12         **MR. ANGUIZOLA:**  If you go to the website and you look

13   at the information after that asterisk, it is not clear and

14   conspicuous.  It is in mouse print.  And a consumer that

15   scrolls through is not going to see that especially in light of

16   the more prominent free claim that happens above.

17         I think also a consumer is not necessarily going to go

18   through the little cards and know to pick those when there is a

19   big prominent claim that says "free" and they can click on an

20   orange button that says "file for free."

21         There is no typo.  There is -- there were different date

22   ranges that the investigator provided in the declaration.

23         So the 571 consumer complaints deal with a different date

24   range then the 57.

25         **THE COURT:**  Thank you.  Submitted.  Thank you.

PROCEEDINGS

1          **MR. ANGUIZOLA:**  Thank you, Your Honor.

2          **MR. WAXMAN:**  Thank you.

3              (Proceedings adjourned at 11:38 a.m.)

4                      ---oOo---

5

6                  <u>CERTIFICATE OF REPORTER</u>

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:   Wednesday, April 27, 2022

11

12

13

14   _____

15        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter

16

17

18

19

20

21

22

23

24

25